IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ERIN LITTLE,                          )
                                      )
            Plaintiff,                )        Case No.
                                      )
v.                                    )
                                      )
Gray Media Group, Inc., d/b/a KCTV 5  )        Jury Trial Demanded
4500 Shawnee Mission Parkway          )
Fairway, KS 66205                     )        Designation of Trial: Kansas City, KS
                                      )
      Serve: CT Corporation System    )
             112 SW 7th St., Suite 3C )
             Topeka, KS 66603         )
                                      )
            Defendant.                )

## COMPLAINT

COMES NOW Plaintiff, and for her cause of action against Defendant Gray Media Group, Inc., d/b/a KCTV 5, states and alleges the following:

## PARTIES

1.      Plaintiff is a resident of Prairie Village, Johnson County, Kansas.

2.      Plaintiff is a Caucasian female, age 44, who at all times relevant, was an eligible employee as that term is defined in 29 U.S.C. §2611(2).

3.      Defendant Gray Media Group, Inc., is a foreign corporation organized and existing under the laws of Delaware with its principal place of business in Georgia, and that is doing business in Kansas at the address set forth above.

4.      At all times relevant herein Defendant Gray Media Group, Inc., was Plaintiff's employer and Defendant employed more than 50 employees for each working day in each of 20 or more calendar weeks, making Defendant an employer as defined by 42 U.S.C. § 2000e(b), 29 U.S.C. § 630(b) and 29 U.S.C. § 2611 (4).

1

5.      At all times relevant hereto, Plaintiff was an employee of Gray, as that term is defined in 42 U.S.C. §2000e(f), 42 U.S.C. 12111(4) and 29 U.S.C. § 630(f). At all times relevant hereto, Defendant Gray had more than 500 employees.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, to wit: Title VII of the Civil Rights Act of 1964, 42 USC 2000e, et seq., the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. and the Family Medical Leave Act 29 U.S.C. § 2601 et seq.

7.      Jurisdiction also exists over this matter pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendant are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

9.      On or about December 5, 2022, Plaintiff timely filed a charge of discrimination, alleging that Defendant discriminated against her on the basis of her gender, age, and disability and that Defendant retaliated against Plaintiff for making internal complaints of discrimination.  A true and correct copy of Plaintiff's charge of discrimination is attached hereto as Exhibit A and incorporated herein by reference.

10.     The discriminatory acts that give rise to this cause of action all occurred within 300 days of Plaintiff's filing of the Charge of Discrimination.

11.     On or about February 7, 2023, Plaintiff filed an amended charge of discrimination alleging an additional retaliation that occurred after and because Plaintiff

filed a charge of discrimination.  A true and correct copy of Plaintiff's amended charge of discrimination is attached hereto as Exhibit B and incorporated herein by reference.

12.    On June 15, 2023, Plaintiff received a notice of Right to Sue from the EEOC and this suit has been filed within 90 days of receipt of the Notice of Right to Sue.  A copy of the Notice of Right to Sue is attached hereto as Exhibit C and incorporated herein by reference.

## ALLEGATIONS COMMON TO ALL COUNTS

13.    Plaintiff began working as a Morning Meteorologist for KCTV5 (then owned by Meredith Corporation) in March of 2018,

14.    In November 2021, Plaintiff was promoted to Chief Meteorologist following the execution of a written employment contract which runs at most through January 16, 2025.

15.    In December 2021, following the execution of the employment contract referenced above, Gray Media Group, Inc., purchased Meredith Corporation, and became the successor in interest to Meredith's rights and obligations under Plaintiff's Employment Agreement

16.    In December 2021, Defendant Gray began placing employees from other television markets owned by Gray into management positions at KCTV5, beginning with the appointment of Andrew Stewart as the station's General Manager that month.

17.    In February 2022, Defendant appointed Kate Glover as News Director.

18.    All actions by Glover and Stewart were taken in their capacity as supervisory and management personnel of Gray, and therefore constitute acts of Defendant Gray.

19.     Shortly after arriving, Stewart and Glover began a campaign of discrimination and harassment toward Plaintiff and other female employees.

20.     For example, one of Glover's first acts as News Director was to demote Kelli Taylor, an African American female, from her position as the third anchor to a lower position as a field reporter.

21.     Taylor has a discrimination lawsuit pending against Defendant Gray as a result of the actions of Glover and Stewart, alleging discrimination based upon race, sex, disability and the taking of FMLA leave.

22.     Glover hired primarily if not exclusively white male employees into open positions, demonstrating her preference for hiring males over females.

23.     Shortly after his arrival, Andrew Stewart told Plaintiff that he did not agree with the terms of her validly executed Employment Contract and advised Plaintiff that her contract was "not a deal that I would have done".

24.     Because Defendant's market research data reflected Plaintiff consistently received favorable ratings from viewers, Plaintiff interpreted Stewart's comment to mean that Plaintiff was overpaid for a female.

25.     At the time of Stewart's statement Plaintiff's record was devoid of any indication that Plaintiff had any performance or disciplinary issues.

26.     Upon information and belief, Stewart and Glover began to gossip about Plaintiff and criticize Plaintiff and other female employees in conversations with employees and outside vendors.

27.     Despite Plaintiff being Chief Meteorologist, and the fact other meteorologist and weather department employees participated in the process for the hiring of other

meteorologist positions, Plaintiff was excluded by Stewart and Glover from any participation or input into the hiring process in order to humiliate and undermine Plaintiff and, also to retaliate against her for her prior complaints of discrimination, harassment, and retaliation.

28.     On September 28, 2022, Plaintiff emailed Andrew Stewart a complaint, captioned **REPORT OF DISCRIMINATION 9/28,** which contained a detailed chronological summary of specific acts of discrimination and harassment she had experienced up to that point. The bullet pointed and date specific email specifically alleged that Andrew Stewart was engaging in gender discrimination.  To date, Plaintiff has never been contacted in connection with any investigation of Plaintiff's complaints, let alone notified of any remedial measures taken in response to the specific complaints of discrimination and retaliation made in this email, as follows:

a.      On August 3, 2022, without prior notice, Plaintiff was asked by management to agree to change her schedule from a Monday through Friday schedule with weekends off, to a Sunday through Thursday schedule.  When Plaintiff declined to agree due to family considerations, she was told her allotted vacation time and the amount of her compensation were both excessive.

b.      The next day on August 4, 2022, Stewart summoned Plaintiff to his office and berated her by holding up two pieces of paper that he claimed were market studies which reflected that Plaintiff was at the bottom of 10 other area meteorologists.  Stewart did not permit Plaintiff to actually read the pieces of paper in order to evaluate what she was being told. Plaintiff was never shown any such study at any other time or in any other setting.  That same day, Defendant accused

plaintiff of having excessive vacation and compensation.  Stewart again brought up ending Plaintiff's contract.

c.      On August 5, 2022, Plaintiff lodged with Human Resources a formal complaint of discrimination and retaliation against Stewart and Glover, informing HR "that I was being bullied and harassed to leave my contract early."  This complaint marked the beginning of a lengthy period of retaliation.

d.      On August 16, 2022, Defendant announced that the weather team would be moved upstairs, to a smaller, less private work area.  Shortly thereafter Plaintiff began hearing from coworkers that Andrew Stewart was gossiping and telling her coworkers that the move of the weather department was prompted by Stewart's desire to "Keep an eye on Erin's dinner break."  These remarks by Stewart damaged Plaintiff's relationships and reputation in the workplace.  Even up through the present time, Plaintiff had never been counseled or written up concerning any alleged issues with her dinner breaks, which were scheduled to allow her time with her family.

e.      On August 17, 2022, Plaintiff complained that comments Stewart had made in management meetings that were critical of Plaintiff were leaked to a coworker.

f.      On August 29 or 30, 2022, Plaintiff requested time off on a Sunday in October. Assistant News Director Aurora Nelson admonished Plaintiff for asking for even one Sunday off and warned her that she should not ask to take other Sundays off.

g.      On September 1, 2022, Plaintiff was ordered into a meeting, for which the notice was entitled "Erin's Workplace issues."  Plaintiff had received no prior written

notice of performance issues, yet Plaintiff was reprimanded and criticized concerning vacation time and leadership.  Andrew Stewart claimed that every week he had to deal with "issues" related to Plaintiff, although Stewart was unable to provide any examples or documentation of any previous discussions of any issues related to Plaintiff's leadership or performance. Plaintiff had never been presented any write ups to sign concerning leadership or performance.

h.      On September 5, 2022, Plaintiff was ordered to assume responsibility for scheduling for the weather team. By September 20, 2022, Aurora Nelson had taken this responsibility away from Plaintiff.

i.      Also on September 5, 2022, Plaintiff requested to use sick time in order to care for her husband who was scheduled for surgery.  But management pushed back by directing that Plaintiff would be required to use PTO.  Only after Plaintiff requested that she be shown any such written policy, did management relent and approve her request for sick leave to care for her husband following his surgery. This episode was another incident of gender discrimination.  Upon information and belief, other female employees have accused Defendant of gender discrimination in connection with the way in which requests for sick time are handled.

j.      On September 8, 2022, Plaintiff was reprimanded for a social media post in which Plaintiff offered to donate her dresses and clothing to women in need.  This reprimand was gender discrimination.

k.      On September 9, 2022, the mirror used by the weather department was suddenly removed without explanation.  This mirror was used predominantly by the females in the weather department to prepare for on air appearances to get

"camera ready" and its removal affected the female employees more severely than the male employees. Plaintiff thereafter reported that this action was taken as another example of gender discrimination.

l.      On September 22, 2022, Plaintiff documented that she believed that she was stripped of scheduling responsibilities. She documented that Defendant denied information on the holiday work schedule. The holiday schedule that management developed adversely impacted females including Plaintiff and a female coworker in that they are the only ones on the weather team to request time off around the holidays. Both females' requests for time off were denied.

m.      On September 23, 2022, following the documentation the previous day regarding Plaintiff being stripped of scheduling responsibilities, Plaintiff learned that individuals who had not even applied for a meteorologist position were being contacted to interview for meteorologist positions.

n.      On September 26, 2022, Plaintiff complained that as Chief Meteorologist she was not allowed to participate in screening applications for open meteorologist positions. Plaintiff was also not advised as to the dates or times of interviews and was excluded from the interviews of prospective employees that she would be working with, causing her to lodge a complaint with Human Resources.

29.      On or about September 27, 2022, Kate Glover approached Plaintiff in the newsroom and told Plaintiff in front of other employees that a weather candidate was being interviewed. This was done to humiliate Plaintiff given that it was common knowledge that Plaintiff was being excluded from the interview and hiring process.

30.     Thereafter, Plaintiff was excluded from these interviews despite the interview process involving a dozen employees other than Plaintiff.

31.     Later, Kate Glover approached Plaintiff in a crowded newsroom to announce that she would not be allowed to attend an upcoming interview.  Glover's remarks in the newsroom were intended to further embarrass, humiliate, and undermine Plaintiff.

32.     In the September 26th conversation in the newsroom, Glover demanded that Plaintiff attend a meeting with a consultant at 12:30 the following day.  Glover scheduled the meeting two hours **before** the start of Plaintiff's scheduled workday, with less than 24 hours' notice, to lessen the likelihood that Plaintiff could or would attend the meeting.

33.     Glover's demeanor during this conversation, conducted in the presence of other employees, was aggressive and demeaning. Glover's conduct was calculated and intended to create a hostile working environment and further intended to demean and belittle Plaintiff in front of coworkers by bullying Plaintiff and demanding that she attend a meeting scheduled without Plaintiff's input upon less than 24 hours' notice.

34.     At 4:41 p.m. on September 27, 2022, Plaintiff formally complained that the interview appeared to be designed to hire her replacement.  Plaintiff also complained that this interview was scheduled with "some amount of advance coordination" and that these facts supported the conclusion that the interview was being undertaken in order to replace Plaintiff.  Despite the complaint, no investigation was ever undertaken.

35.     That same day Kate Glover responded to Plaintiff with a demeaning and retaliatory email that said: "Hello Erin, To be clear, you are not a supervisor and nobody

reports to you.  You are not a manager.  Everyone in the news department reports to me and I do all the hiring." This demeaning email was intended to retaliate and humiliate Plaintiff in response to Plaintiff's numerous complaints of discrimination, harassment, and retaliation.

36.     During a live broadcast on September 28, 2022, Plaintiff emailed Aurora Nelson for technical assistance with the telecast after a new software application (ENPS) was launched for all newsroom staff. Ms. Nelson sent a letter stating she would be available for support for all staff if needed. The Plaintiff was not able to access the software and requested support during the live broadcast but rather than provide support, Nelson replied, "That's a Joe issue—I'll pass this along to him."  Upon information and belief, Nelson knew at the time of making this statement that "Joe" was not in the building.

37.     In response to Nelson's refusal for assistance, Little repeated her request for technical assistance and Nelson again ignored the request.  Plaintiff never received the assistance requested during the telecast because "Joe" was not on duty.  Without access to this ENPS software the Plaintiff was unable to edit/submit Closed Captioning which could have violated FCC regulations and would be grounds for termination. These actions were undertaken by Nelson in retaliation for Plaintiff's complaints of discrimination, harassment, and retaliation.

38.     On September 28, 2022, at 9:34 p.m., Little emailed Nelson, Andrew Stewart and Glover and once again complained that Aurora Nelson's refusal to provide on air support "appears to be blatant retaliation for my discrimination complaint today…I expect **this complaint of retaliation to be fully investigated and that no further**

**retaliation or discrimination be permitted.  Do I need to forward my complaint of retaliation to someone in Human Resources?  Please advise."**

39.     Following Plaintiff's complaints Plaintiff's work hours and schedules were drastically changed without consultation or warning. Plaintiff's weekend schedule was altered to force Plaintiff to work every Sunday when her prior schedule only had her working Monday thru Friday.  Plaintiff's new schedule only permitted her one Sunday off duty per year. The change in Plaintiff's work schedule was further retaliation in response to Plaintiff's complaints of discrimination, harassment, and retaliation.

40.     Rather than complying with the Company policies forbidding discrimination and retaliation, Aurora Nelson sent a condescending and facially retaliatory reply to Plaintiff's complaints at 11:25 p.m. on September 28, 2022.  Nelson concluded the email by acknowledging, "There's no need for you to forward your complaint to HR, I've copied Laurel so she could read the false allegations you made against your manager."  Nelson carbon copied Andrew Stewart, Kate Glover and HR Manager, Laurel Berenguer.  To this date Plaintiff is unaware of any remedial measures being undertaken by HR, management or legal.  Instead, they subjected her to hostility, discrimination, and retaliation.

41.     On or about September 30, 2022, Laurel Berenguer responded to Plaintiff's "Report of Discrimination 9/28" noting that she had received this complaint from Andrew Stewart and stated that she would be investigating the complaint.  In this same email, Berenguer falsely asserted that Plaintiff had raised the issue of "ending your contract" in order to create the false impression that Plaintiff was seeking a buyout of her contract.

11

To the contrary, it was Andrew Stewart who had raised the buyout on August 4, in response to Plaintiff's accusations of discrimination and retaliation.

42.     Plaintiff objected to Laurel Berenguer being assigned the responsibility of investigating her numerous complaints of discrimination due to her personal involvement in the discrimination and harassment against Plaintiff.  The Defendant's decision to assign one of the managers accused of discrimination and retaliation to "investigate" is itself an act of retaliation.

43.     On October 11, 2022, Plaintiff responded to Berenguer's 9/30/22 email.  In this email Plaintiff stated: "Please be aware that I have sent more than one complaint of discrimination and retaliation.  It seems that since August, actions have been ramping up, worsening, and intensifying, in what seems to be an effort to get me to quit.  Interviews of males for a meteorologist position have taken place with me being kept in the dark and completely excluded from the process while the applicants auditioned with the newscasters and met other members of the weather team.  You were copied on my complaint of September 27, 2022.  The concerns in that email should be included in the investigation.  Did anyone forward to you my complaints of September 27, 2022, and September 28, 2022 to Aurora Nelson, Andrew Stewart, and Kate Glover?  Additional acts of retaliation occurred on October 10, 2022, during the newscasts before and after the Chiefs game on Monday Night Football.  Did anyone send my complaints to you?  The actions of reducing my news hit time during my segments and moving my hits within the news segments should be investigated."

44.     This October 11, 2022, complaint also included Plaintiff's report that Berenguer had misrepresented facts concerning the Plaintiff seeking a buyout.  Plaintiff

denied this and informed Defendant that she would not be seeking a buyout or leaving her position.   Despite this revelation, and her clear conflict of interest, Berenguer continued with this inquisition. This conduct was additional retaliation in response to Plaintiff's complaints of discrimination, harassment, and retaliation.

45.     On October 13, 2022, at 6:08 p.m. Plaintiff composed another email detailing additional acts of discrimination and retaliation pertaining to Plaintiff's request for vacation time.   During this same time frame Plaintiff continued to orally insist that Berenguer be removed or replaced as the investigator of her 9/28/22 complaint.

46.     On October 17, 2022, Defendant assigned Laurel Berenguer to be her own arbiter in connection with Plaintiff's request that she be replaced as the investigator.

47.     On October 25, 2022, Kate Glover accused Plaintiff of inappropriate conduct regarding a post made by Plaintiff on social media.  Glover criticized Plaintiff for a social media post that contained wording similar to that used by the Assistant News Director on the same date.  Plaintiff provided Glover with the social media post created by Aurora Nelson and furthermore provided the actual post with a color photo.  Glover ignored Plaintiff's information.  These actions were further acts of retaliation in response to Plaintiff's complaints of discrimination, harassment, and retaliation.

48.     On October 26, 2022, Plaintiff received an email from Maurice Gibson concerning her request that Berenguer be removed as the investigator.  As of that date, no person in management, HR or legal had yet interviewed Plaintiff about her allegations pertaining to Berenguer's lack of objectivity as an investigator.   Instead of removing Berenguer, Gibson claimed that he would "review" Berenguer's "investigation".  All these

actions were further acts of retaliation in response to Plaintiff's complaints of discrimination and retaliation.

49.     Although Plaintiff continues to maintain the title of Chief Meteorologist, Defendant has stripped Plaintiff of all her duties and responsibilities for this position.

50.     Plaintiff made additional written complaints of discrimination, harassment, retaliation, and hostile working conditions on the following dates:

a.      On October 11, 2022, Plaintiff complained of discrimination/retaliation in an email to Kate Glover, Aurora Nelson, Andrew Stewart, and Laurel Berenguer captioned, "Erin Little Retaliation 10/10."

b.      On October 13, 2022, at 6:04 p.m., Plaintiff complained again to Glover and copied Berenguer, Larry Eighme and Jan Goldstein that Kate Glover was retaliating against her for earlier complaints by making her find her own replacement when using PTO or sick time.

c.      This same email also reports that Glover and Aurora Nelson stripped Plaintiff of her staffing responsibilities as further retaliation.

d.      On October 27,2022, Plaintiff complained in an email to Maurice Glover, Mike King, Jan Goldstein, Laurel Berenguer, Larry Eighme, and Kate Glover that she was being retaliated against on a daily basis for her earlier complaints of discrimination.  Plaintiff specifically accused management of encouraging each other to take actions to create a hostile working environment in order to force Plaintiff to resign.

e.      On November 6, 2022, Plaintiff complained to Glover, Pat LaPlatney, Mike King, Jan Goldstein, Maurice Gibson, Laurel Buerenguer, Larry Eighme,

and Amy Rose concerning the ongoing acts of discrimination and retaliation that included actions taken to strip her of duties surrounding hiring in the Weather Department.  This complaint addressed the hiring of Warren Sears and further accused Defendant of daily acts of retaliation in response to earlier complaints of discrimination and retaliation.

f.    On November 14, 2022, the same individuals included on the November 6, 2022, email received another specific complaint of discrete acts of discrimination and retaliation designed to create a hostile working environment that would force Plaintiff to resign.

g.    Plaintiff also complained about discriminatory treatment she received for making posts on Defendant's FACEBOOK page.

h.    Later complaints include plaintiff's formal charge of discrimination for removing Plaintiff from on air broadcasts.  The formal charge is attached to the Petition and incorporated herein as Exhibit "A."

51.    Following Defendant's unilateral decision to remove Plaintiff from appearing on air, Defendant further retaliated against Plaintiff for her complaints by refusing to allow Plaintiff to participate in any public events representing the Station and directing Plaintiff that she was not permitted to post anything on social media as a representative of the Station or as an employee of Gray/KCTV/KSMO.

52.    Following Plaintiff's complaints to Human Resources concerning discrimination, harassment, and retaliation, no one in Human Resources or Legal ever attempted to contact Plaintiff regarding any remedial measures as required by the January 15, 2019, Gray Employee Handbook.   At pages 27-28 of the Handbook,

Defendant has codified its **COMPLAINT PROCESS** and **INVESTIGATION OF COMPLAINTS** policies at Sections 4.9 and 4.10.

53.     Throughout 2022, Plaintiff made numerous oral and written complaints in full compliance with Section 4.9.  This same policy prohibited the bullying behavior of both Kate Glover and Aurora Nelson.   To date no one in management, Legal or Human Resources has contacted Plaintiff about any remedial measures undertaken in response to her numerous and specific complaints of discrimination, harassment, retaliation, and bullying.  To the present date, Plaintiff remains banned from the premises and cut off from access to the workplace.   Plaintiff continues to be denied any on air appearances or newscasts.

54.     Section 4.10 of Defendant's Employee Handbook describes in detail the Defendant's policy concerning Investigation of Complaints.   This policy promises employees that "The Company will **promptly investigate all complaints of discrimination, harassment, bullying and retaliation and other forms of impermissible conduct with due regard for confidentiality, and quickly apply appropriate sanctions that will end any offensive or inappropriate behavior."**

55.     Section 4.11 of Defendant's Employee Handbook contains a written promise that "The Company will not retaliate against any employee because of reports of alleged discrimination or harassment or other inappropriate conduct or because of cooperation with any internal or external investigation."

56.      Despite these written promises in Defendant's Employee Handbook Plaintiff is unaware of any remedial or disciplinary measures taken in response to her numerous complaints of retaliation for her complaints of discrimination.

57.    Defendant has engaged in a pattern and practice of ignoring other complaints of discrimination, harassment, and retaliation.   Defendant is presently defending a different discrimination lawsuit involving allegations of discrimination against Kate Glover, in the case captioned, Kelli Taylor v. Gray Television, Inc.   This case is presently pending in the US District Court in Kansas City, Kansas.

58.    Since the filing of this lawsuit, Plaintiff has continued to experience harassment, discrimination, and retaliation for her complaints, all in violation of written corporate policies prohibiting illegal discrimination, harassment, and retaliation.

59.    In October of 2022, General Manager Stewart was abruptly removed from his position as General Manager of KCTV5.   No explanation was given to Plaintiff concerning whether the separation of Stewart was in response to Plaintiff's complaints of discrimination or complaints of other employees of KCTV5.   Since the date of Stewart's removal no one from legal, management or Human Resources has contacted Plaintiff about remedial measures undertaken in response to her numerous complaints of discrimination, harassment, and retaliation in violation of written corporate policies prohibiting discrimination, harassment, and retaliation.

60.    On Thursday, November 17, 2022, Plaintiff was confronted by a stalker at an event that Plaintiff was conducting for her non-profit.   The stalker was Facebooking live and videotaping Plaintiff and directed several odd comments/questions to Plaintiff and then remained at the event after the event concluded.   The Police were summoned for the safety of Plaintiff and those in attendance.

61.    Plaintiff followed protocol and immediately reported this incident to Kate Glover.    Plaintiff informed Glover that while Plaintiff was in the ACA business club in

Shawnee, a stalker arrived posing as a KCTV5 photographer.  Plaintiff texted Glover a photograph and other identifying information obtained from the police department, so that Glover could post the information at the station pursuant to protocol for plaintiff's protection.

62.    Despite the existence of the protocol, and the fact that Plaintiff provided Glover with the information necessary to identify this individual so that he could be prevented from entering the station, Glover failed to post the picture of the stalker in the designated area in the building, failed to inform station employees of the incident and otherwise failed to take any actions to protect the safety of Plaintiff and other station employees.

63.    The stalker incident left Plaintiff terrified, stressed, and concerned for her safety.  As a result of the failure of Defendant to follow its own policies designed to protect her safety, Plaintiff was unable to complete her scheduled shift and left work early on that day.

64.    Plaintiff believes that the failure of KCTV5 to take protective measures was additional and calculated retaliation against Plaintiff for her complaints of discrimination, harassment, and retaliation as well as a violation of its own written policies and procedures.

65.    Plaintiff was not scheduled to work on Friday, November 18, 2022, or Saturday, November 19, 2022.

66.    Plaintiff returned to work on Sunday, November 20, 2022, and resumed her normal job duties.  During the course of the day, Plaintiff engaged in protected activity by informing some of her coworkers of her good faith belief that she was being discriminated

against on the basis of her age and gender and in retaliation for making complaints of discrimination. Following this conversation all of them returned to work without incident and Plaintiff left for her regular dinner break.

67.    During her dinner break on November 20, 2022, Plaintiff received a call from HR Manager, Laurel Berenguer, who ordered her not to return to work because of an alleged but unspecified "incident" at work. Plaintiff inquired as to the nature of the alleged incident and was told that she and Berenguer would discuss it the following day. Plaintiff advised Berenguer that she had no idea what she was talking about, and that there was no reason for Plaintiff not to return to work. At this point Berenguer became angry and threatening and said "I am instructing you not to return to work."

68.    Within ten minutes of the conversation with Berenguer, Plaintiff was notified that she had been removed from the work roster for the next three days. In response, Plaintiff called Assistant News Director, Aurora Nelson and left a message inquiring as to the reason for her removal from the work schedule. Plaintiff's message was not returned and within ten minutes, at 6:12 p.m. on November 20, 2022, Plaintiff lost access to her work emails and her computer. Plaintiff immediately called co-worker Gary Amble and asked him if he was called into work. Amble confirmed that he had been called into work.

69.    The next day on November 21, 2022, Plaintiff called in and spoke to Nick Vlaskin, the manager on duty, to report her absence. Following that call Plaintiff received a phone call from Union Representative, Amy Rose. Rose informed Plaintiff that Berenguer had attempted to hold a previously scheduled meeting that same day – despite Plaintiff's absence – and that Berenguer pretended that she did not know why Plaintiff failed to attend the meeting. At this point Plaintiff was notified that she was being placed

on a three day leave of absence so the company could immediately investigate the events of the previous evening. Plaintiff's immediate suspension in connection with the investigation was further discrimination and retaliation.

70.    Upon information and belief, at some point thereafter Plaintiff's coworkers were told, among other things, that Plaintiff's conduct and behavior had become disruptive and erratic and that Plaintiff would not be returning to the workplace.  These demeaning labels were used by Defendant's agents to further undermine Plaintiff with her coworkers, to damage her work reputation and to perpetuate a hostile and unwelcome working atmosphere based upon Plaintiff's anxiety and medical condition.  Plaintiff's work reputation was severely damaged with her co-workers and Plaintiff was subjected to ridicule, humiliation, and embarrassment by management in direct retaliation for Plaintiff's previous complaints to HR of protected activity.

71.    To date, Plaintiff has never been contacted about any sanctions or disciplinary measures taken as a result of Plaintiff's complaints of discrimination, harassment or retaliation, and Plaintiff has been illegally expelled from her position and denied access into the workplace.

72.    Plaintiff's reputation in the television industry has also been severely damaged by intentional acts of Defendant.

73.    Plaintiff was notified by Defendant that they intended to complete their "investigation" of her internal complaints without interviewing her and without receiving any further information from Plaintiff as to her complaints or her knowledge of corroborative and supporting information.  Plaintiff has received no written conclusion or

findings concerning her complaints of discrimination, harassment, hostile working environment and retaliation, in violation of stated and written corporate EEO policies.

74.     Plaintiff took a medical leave of absence based upon work related stress and anxiety stemming from the discrimination, retaliation, and hostile work environment. This leave of absence was approved by her treating physician.

75.     Following Plaintiff's internal complaints of age, gender and disability discrimination and retaliation, Plaintiff was further retaliated against by management and Human Resources for voicing and documenting complaints of discrimination and retaliation and remains suspended from her regular job duties.

76.     Defendant has failed to abide by its own written anti-discrimination policies and has failed to take any remedial action for the injuries to Plaintiff's reputation and contractual rights.

77.     Plaintiff has been denied her right to return to her position as set forth in her written contract of employment. Plaintiff should be reinstated.

78.     Plaintiff has lost income, benefits and suffered damage to her personal and professional reputation by the discriminatory and retaliatory actions of Defendant and continues to suffer severe harm to her professional reputation and in the community, by virtue of Defendant removing Plaintiff from the air with no explanation to the viewing public.

<u>**COUNT I**</u>
<u>**SEX/GENDER DISCRIMINATION**</u>

79.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

80.     Defendant's actions as set forth above constitute discrimination against Plaintiff on the basis of Plaintiff's sex or gender, female.

81.     Defendant knew or should have known of the discrimination against Plaintiff, based on Plaintiff's sex or gender and, despite Plaintiff's complaints, failed to investigate these complaints or implement prompt and appropriate corrective action.

82.     Through the actions set forth in the foregoing paragraphs, Defendant intentionally discriminated against Plaintiff based on Plaintiff's sex or gender in violation of Title VII.

83.     Defendant maintained inadequate written policies, procedures, or guidelines with respect to retaliation for reports of discrimination based on Plaintiff's gender.

84.     As a result of the above-mentioned discrimination, Plaintiff was damaged, and is entitled to all remedies available to her as provided by Title VII. Such remedies include, but are not limited to, damages for loss of income, embarrassment, humiliation, emotional distress, damage to her reputation, diminution in earnings capacity, and other damages yet undetermined, and Plaintiff is reasonably expected to suffer from such damages in the future. Plaintiff also is entitled to reinstatement and/or front pay.

85.     Defendant's conduct constitutes intentional discrimination on the basis of Plaintiff's sex or gender with malice, and/or reckless disregard of Plaintiff's known rights.

86.     Defendant's conduct was outrageous because of Defendant's evil motive or reckless indifference to the rights of Plaintiff, thereby entitling Plaintiff to punitive damages in an amount that will punish Defendant and will deter Defendant and others from like conduct.

87.     Plaintiff is entitled to attorney's fees.

WHEREFORE, Plaintiff prays judgment against Defendant on Count I in an amount that is fair and reasonable, for punitive damages, for reinstatement or front pay, for her costs and attorneys' fees, and for such other equitable relief as this Court deems just and proper.

## COUNT II
## RETALIATION

88.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

89.     Plaintiff made internal complaints of gender, age and disability discrimination and retaliation as set forth above.

90.     Plaintiff also filed a discrimination charge with the EEOC on December 5, 2022 and amended this charge on February 7, 2023.

91.     Following Plaintiff's complaints of discrimination, harassment and retaliation, Plaintiff was subjected to a retaliatory investigation and involuntarily removed from her position as the on air, Chief Meteorologist, and banned from entering the workplace.

92.     Defendant's abrupt removal of Plaintiff from her regular broadcasts caused plaintiff to suffer severe and permanent damage to her professional reputation as an on-air Chief Meteorologist.

93.     Defendant failed to conduct any meaningful investigation of any of Plaintiff's complaints of gender, age and disability discrimination and retaliation, and Defendant failed to take any remedial action regarding Plaintiff's complaints of illegal discrimination, harassment, and retaliation.

94.     Defendant's conduct constitutes intentional retaliation for Plaintiff's complaints of discrimination on the basis of gender, age, and disability.

95.      Defendant's conduct as set forth above was taken with malice, and/or reckless disregard of Plaintiff's known rights entitling Plaintiff to punitive damages.

96.     Defendant's actions as set forth above constitute an intentional pattern and practice of retaliation based on reports of discrimination and retaliation on the basis of Plaintiff's gender in violation of Title VII.

97.     As a direct and proximate result of Defendant's unlawful acts of retaliation, Plaintiff has suffered damages, including, but not limited to, economic loss in the form of lost wages and lost benefits, future wages and lost earnings, damage to her professional reputation and career, as well as emotional and mental distress. Plaintiff also is entitled to reinstatement and/or front pay.

98.     Plaintiff is entitled to attorney's fees.

WHEREFORE, Plaintiff prays judgment against Defendant on Count II in an amount that is fair and reasonable, for punitive damages, for reinstatement or front pay, for her costs and attorneys' fees, and for such other equitable relief as this Court deems just and proper.

## COUNT III
## AGE DISCRIMINATION

99.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

100.     Plaintiff's age was a determining and motivating factor in Defendant's actions as set forth above and, as such, Defendant's actions constitute age discrimination in violation of the ADEA.

101.    Plaintiff is entitled to all lost wages and damages as shown by the evidence, plus, an additional and equal amount as liquidated damages, given that Defendant's actions were willful, in that they were taken with the knowledge they violated federal law, or were taken with reckless disregard for that law.

WHEREFORE, Plaintiff prays judgment against Defendant on Count III in an amount that is fair and reasonable, for double said amount as liquidated damages, for her costs and attorneys' fees, and for such other equitable relief as this Court deems just and proper.

### COUNT IV
### VIOLATIONS OF THE FMLA

102.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

103.    In Sept 2022, Plaintiff began to experience symptoms that required continuing treatment from a health care provider and thus constituted a serious health condition as defined by 29 USC 2611 (11).

104.    On November 21, 2022, Plaintiff requested leave from Defendant pursuant to the Family and Medical Leave Act and provided the necessary certification.

105.    On January 17, 2023, Plaintiff was released from her doctor to return to work with no restrictions, and Plaintiff so informed Defendant.

106.    On February 6, 2023, Defendant discriminated against Plaintiff for exercising her FMLA rights, when Defendant refused to restore Plaintiff to the position she held before her leave or to an equivalent on-air position. Plaintiff has suffered loss of employment, and will lose compensation and benefits in an amount to be determined at trial.

107.    Pursuant to 29 USC 2617, Plaintiff seeks recovery of all lost wages, salary and employment benefits, interest thereon, plus an additional equal amount as liquidated damages. Plaintiff also seeks equitable relief in the form of an Order reinstating Plaintiff to her position as on-air Chief Meteorologist.

108.    Plaintiff is entitled to attorney's fees.

WHEREFORE, Plaintiff prays judgment against Defendant on Count IV for all lost compensation and benefits, interest thereon, doubled in the form of liquidated damages, plus an Order reinstating Plaintiff to her position as on-air Chief Meteorologist.  Plaintiff also demands her costs and reasonable attorney's fees, and such further equitable relief as the Court deems just and proper.

**DESIGNATION OF PLACE OF TRIAL AND DEMAND FOR JURY TRIAL**

Plaintiff designates Kansas City, Kansas as the location for trial of this matter and demands a trial by jury of all issues so triable herein.


Respectfully submitted,

**THE POPHAM LAW FIRM, PC**

By: /s/ Dennis E. Egan
Dennis E. Egan, KS  70672
712 Broadway, Suite 100
Kansas City, Missouri 64105
(816) 221-2288
(816) 221-3999 facsimile
degan@pophamlaw.com

**WHITE, ALLINDER, GRAHAM, BUCKLEY, & CARR, L.L.C**

By:  /s/ Gene P. Graham, Jr.
Gene P. Graham, Jr., KS 70615
Deborah J. Blakely,  KS 19010
19049 East Valley View Parkway
Independence, Missouri 64055
(816) 373-9080 Fax: (816) 373-9319
ggraham@wagblaw.com
dblakely@wagblaw.com


**THE MEYERS LAW FIRM, LC**

By:  /s/ Martin M. Meyers
Martin M. Meyers, KS 14416
4435 Main Street, Suite 503
Kansas City, Missouri 64111
(816) 444-8500
(816) 444-8508 *facsimile*
mmeyers@meyerslaw.com

**ATTORNEYS FOR PLAINTIFF**