IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ERIN LITTLE,

      **Plaintiff**,

v.

GRAY MEDIA GROUP, INC.,

      **Defendant**.

Case No. 23-2394-DDC

<u>**MEMORANDUM AND ORDER**</u>

A thread—once pulled—can unravel quickly.  In August 2022, defendant Gray Media Group, Inc. intended to "build the brand" at KCTV5 around plaintiff Erin Little, KCTV5's Chief Meteorologist.  Doc. 104-4 at 15 (Aug. 5 Meeting Tr. 14:4–16).  Plaintiff's superiors considered her "part of the main talent team" and "one of the leaders[.]"  *Id.*

But by November 2022, this plan had come apart at the seams.  In just more than four months, plaintiff had lodged numerous complaints of discrimination and retaliation, elevating those complaints all the way to defendant's highest executive:  the Chairman and CEO.  Shortly thereafter, plaintiff took medical leave due—she contended—to the stress from her work environment.  Plaintiff never returned on-air.  When plaintiff's medical leave had ended, defendant exercised a "Pay, No Play" term in plaintiff's contract.  That term required defendant to continue to pay plaintiff's salary but allowed it not to put her in front of the camera, or even have her present at the station.  Defendant also notified plaintiff that it would terminate her contract altogether after a year's time.

Plaintiff filed this employment discrimination action on September 7, 2023. *See* Doc. 1. Plaintiff brings five claims, four under Title VII of the of the Civil Rights Act of 1964 and one under the Family Medical Leave Act. Doc. 80 at 42–43 (Pretrial Order ¶ 4.a.). Plaintiff alleges a sex-based hostile work environment, sex discrimination, retaliation, and retaliatory harassment under Title VII. *Id.* (Pretrial Order ¶ 4.a.i.–ii.). And plaintiff alleges interference under the FMLA. *Id.* at 43 (Pretrial Order ¶ 4.a.iii.). Defendant filed a Motion for Summary Judgment (Doc. 84). As the summary judgment briefing progressed, a dispute arose over a portion of plaintiff's affidavit. The parties were unable to resolve the dispute without the court, and defendant then filed a Motion to Strike (Doc. 103). This Order decides both motions.

The court grants defendant's Motion for Summary Judgment (Doc. 84). The court concludes that plaintiff failed to establish a prima facie case of a sex-based hostile work environment. She never adduced evidence sufficient to create a triable issue of defendant's facially sex-based conduct. Plaintiff also failed to establish a prima facie case of sex discrimination. Plaintiff never adduced evidence from which a reasonable jury could infer discrimination based on sex.

Plaintiff's retaliation and retaliatory harassment claims likewise fail on the prima facie prong. Plaintiff never demonstrated a causal connection between her protected activity and defendant's materially adverse actions sufficient to support a prima facie case of retaliation. And plaintiff's alleged protected opposition falls outside of Title VII protection. And so, plaintiff doesn't shoulder her prima facie burden on any of her Title VII claims. But even if she had, defendant still would have prevailed at summary judgment because plaintiff also fails to create a triable issue of pretext.

Finally, the court also grants defendant summary judgment against plaintiff's FMLA interference claim. Defendant demonstrates that it would have taken the same adverse actions against plaintiff regardless of whether she took FMLA leave—and no reasonable jury could find otherwise.

The court also grants in part and denies in part defendant's Motion to Strike (Doc. 103). To the extent defendant's motion requests that the court disregard one sentence in Paragraph 15 of plaintiff's affidavit, the court grants defendant's motion. The court doesn't consider the disputed sentence in reaching its conclusions here. The court denies defendant's motion to the extent that it asks the court to strike Paragraph 15 altogether and to the extent it requests sanctions and attorney fees. The court explains these rulings, below.

## I.    Background

The following facts are stipulated, uncontroverted or, where controverted, are identified as such and stated in the light most favorable to plaintiff, the party opposing summary judgment. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

### *Plaintiff's Contract*

Defendant's predecessor, Meredith Corporation, first employed plaintiff on January 17, 2018, as a Digital Producer. Doc. 80 at 2 (Pretrial Order Stipulations ¶ 2.a.iii.). A little over a month later, Meredith executed an employment agreement with plaintiff as an AM meteorologist—effective March 1, 2018, to January 16, 2022. *Id.* (Pretrial Order Stipulations ¶ 2.a.v.). Meredith then executed a second employment agreement with plaintiff, this time as Chief Meteorologist, effective January 17, 2022, to January 16, 2025. *Id.* (Pretrial Order Stipulations ¶¶ 2.a.vi., viii.). The 2022 employment agreement provided plaintiff with four weeks vacation, thirteen personal days/holidays, and ten sick days each year. *Id.* (Pretrial Order ¶ 2.a.vii.). The 2022 agreement also included a "Pay, No Play" term. Doc. 9-3 at 8 (Def. Ex. C).

3

That term relieved Meredith of any obligation to "use Employee's services on any program." *Id.* And it provided that Meredith fulfilled its contractual obligation simply by remitting to plaintiff compensation until her employment's termination. *Id.* In short, under the contract's "Pay, No Play" provision, Meredith didn't have to put plaintiff on air. But it did have to pay her.

### *Defendant Acquires Meredith*

In December 2021, defendant acquired Meredith. Doc. 80 at 2 (Pretrial Order Stipulations ¶ 2.a.x.). Meredith merged into Gray Media Group, Inc., with defendant as the surviving entity. *Id.* Defendant owns and operates television stations and digital properties, including Kansas City's KCTV. *Id.* (Pretrial Order Stipulations ¶¶ 2.a.i.–ii.). At acquisition, defendant assumed all terms and conditions of plaintiff's 2022 employment contract with Meredith. *Id.* (Pretrial Order Stipulations ¶ 2.a.xi.). That same month, Andrew Stewart became the General Manager of KCTV5. *Id.* at 3 (Pretrial Order Stipulations ¶ 2.a.xii.). And a few months later, on February 7, 2022, Catherine (Kate) Glover started as KCTV5's News Director. *Id.* (Pretrial Order Stipulations ¶ 2.a.xiii.).

### *Plaintiff's Schedule Change*

At the beginning of August 2022,[1] General Manager Stewart informed plaintiff that her workdays would shift from Monday through Friday to Sunday through Thursday. *Id.* (Pretrial

---

[1] Plaintiff's briefing suggests the court should insert months-worth of allegations from other women before jumping to August 2022. Plaintiff presents pages of facts about the allegedly discriminatory behavior of Stewart toward other KCTV5 female employees which preceded this schedule shift. *See* Doc. 94 at 1–11. But, as the court explains below, *see* § III.A.1.a., plaintiff fails to adduce evidence that she knew about these other women's complaints such that those complaints formed part of her work environment.

Indeed, plaintiff's affidavit asserts just the opposite—that only upon review of discovery did she learn of those complaints. *See* Doc. 94-82 at 2 (Little Aff. ¶ 3) ("I am now aware of the specific information contained within the complaint files produced by Gray. If I had been aware of the details of what had been transpiring at KCTV5 . . . my response to many questions directed at me in my deposition would have reflected that knowledge."). Plaintiff's absence of awareness precludes her reliance on other employees' complaints to establish a hostile work environment. *See Hirase-Doi v. U.S. W. Commc'ns,*

Order Stipulations ¶ 2.a.xiv.).[2]  Other anchors—men and women alike—also experienced this same schedule shift.  Doc. 87-2 at 14 (Little Dep. 80:3–12) (identifying co-anchors Brad Stephens and Carolyn Long's schedule shift to Sundays); Doc. 94-48 at 6 (plaintiff explaining in investigative interview that "[e]veryone's schedule had changed, the directors, all evening talent").  The shift's purported aim was to increase the anchors' airtime on Sundays during the Chiefs' football season.  Doc. 87-2 at 14 (Little Dep. 80:3–12).  The schedule change displeased plaintiff, who didn't want to work on Sundays for family reasons.  Doc. 80 at 3 (Pretrial Order Stipulations ¶ 2.a.xv.).

During these schedule change conversations, Stewart explained that—if she wanted to— plaintiff could discuss with defendant options for plaintiff to leave her contract early.  *Id.* (Pretrial Order Stipulations ¶ 2.a.xvi.).  Stewart testified that plaintiff had asserted that she didn't need the job, and she didn't need the money.  Doc. 87-4 at 3 (Stewart Dep. 111:15–112:18).  And so, in response, he offered to discuss her early departure.  *Id.*  Plaintiff disputes Stewart's version of the events.  Doc. 94-82 at 3 (Little Aff. ¶ 6).  Though she admits saying she didn't need the job, she attests that she continued with "I am choosing this job . . . because I love what I am doing as Chief Meteorologist."  *Id.*  And, she clarified, she "never told anyone at KCTV5 that

---

*Inc.*, 61 F.3d 777, 782 (10th Cir. 1995) ("[Plaintiff] may only rely on evidence relating to harassment of which she was aware during the time that she was allegedly subject to a hostile work environment"), *abrogated on other grounds by Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).  The court supplements this conclusion with a more fulsome analysis, below.  *See* § III.A.1.a.

[2]      The Pretrial Order identifies the schedule shift as moving from Monday-Friday to Thursday-Sunday.  Doc. 80 at 3 (Pretrial Order Stipulations ¶ 2.a.xiv.).  But other evidence in the record suggests the shift was to Sunday-Thursday instead.  *See, e.g.*, Doc. 87-2 at 13–14 (Little Dep. 79:19–80:2) (describing new schedule as "Sunday/Thursday"); Doc. 94-10 at 2 (Pl. Ex. 11) (plaintiff identifying shift in email to Stewart as "Sunday through Thursday").  Plus, plaintiff protested loss of family time on Sunday, but not Saturday.  *See* Doc. 80 at 3 (Pretrial Order Stipulations ¶ 2.a.xv.).  And the added airtime during Chiefs' games supports a Sunday—not a Saturday—shift.  *See* Doc. 87-2 at 14 (Little Dep. 80:3–12).  The court thus assumes the shift was Sunday-Thursday.  In the end, though, using one scenario instead of the other wouldn't alter the court's analysis.

[she] wanted to exit [her] contract." *Id.* She interpreted Stewart's end-the-contract discussion as a "threat not an 'offer.'" *Id.*

The schedule change conversations sparked other conflicts, as well. During one such meeting, Stewart held up pages of a research study containing plaintiff's ranking among Kansas City's meteorologists. Doc. 87-3 at 4 (Pl. Ex. 56A); Doc. 87-2 at 20 (Little Dep. 92:5–7). All the other KC meteorologists listed in the study ranked above plaintiff.[3] Doc. 94-10 at 2 (Pl. Ex. 11); Doc. 87-2 at 20 (Little Dep. 92:5–7). Stewart then explained that the Sunday-Thursday schedule shift would help plaintiff improve that ranking. *See* Doc. 87-2 at 20 (Little Dep. 92:5–14). But Stewart never allowed plaintiff to review the study. *Id.*

Finally, in these schedule change conversations Stewart also commented unfavorably on plaintiff's contractual compensation and vacation terms—finding them both excessive. *Id.* at 10 (Little Dep. 52:3–11). Plaintiff testified that Stewart's manner while doing so was "completely inappropriate[.]" *Id.* (Little Dep. 52:3–21). She testified that he was "irate," "aggressive and hostile," "flailing his hands in the air," which she perceived as an inability to "conduct himself in a professional manner." *Id.* In the context of discussing plaintiff's allegedly excessive pay and time away from her children, Stewart also explained "how he [had] guided his wife through conversations about how to work." *Id.* at 9 (Little Dep. 46:1–11). Plaintiff interpreted Stewart's comments as communicating "how a woman should behave in the workplace[.]" *Id.*

---

[3]    The evidence never establishes conclusively how many meteorologists the study included. Stewart apparently suggested plaintiff ranked lowest among 10 Kansas City meteorologists. Doc. 87-2 at 20 (Little Dep. 92:5–8). But plaintiff's affidavit indicates that—when she had the opportunity to review the study—it ranked her "overall performance fifth out of five, not tenth out of ten[.]" Doc. 94-82 at 2–3 (Little Aff. ¶ 5). The precise number doesn't matter to the court's analysis. Either way, the study ranked plaintiff last among the cohort.

The next day—on August 5, 2022—plaintiff complained to Human Resources that she felt bullied and harassed to leave her contract early.  Doc. 80 at 3 (Pretrial Order Stipulations ¶ 2.a.xvii.).[4]

### *Weather Team Office Moved*

More changes followed.  On August 16, 2022, management moved the Weather Team office upstairs.  *Id.* (Pretrial Order Stipulations ¶ 2.a.xviii.).  The Weather Team included both men and women.  Doc. 87-2 at 4 (Little Dep. 38:3–4) (identifying Warren Sears as a male employee on the Weather Team); *id.* at 12 (Little Dep. 72:1–11) (identifying Gary Amble, Alena Lee, and Mr. Bennett as members of the KCTV5 weather department).  In short, the worksite relocation affected the offices of both men and women.  *See id.* at 25 (Little Dep. 123:1–8) (agreeing that Mr. Bennett was part of the weather team at the time of the office move and the move "would have similarly affected him").  Plaintiff objected to the size of the new weather room—which was "1/3 smaller" than the previous space—as well as to the size of the weather room desks compared to the size of the main anchor's desks.  Doc. 87-6 at 6 (Def. Ex. 7).  And she contended the move made it harder to do her job.  *See* Doc. 94-90 at 29 (Little Dep. 121:3–16) (plaintiff explaining that—unlike other anchors—the Weather Team produces its own graphics and writes its own content, so moving it farther away from the newsroom "creates a harder pathway to do [their] jobs").

---

[4]    The parties dispute whether plaintiff described Stewart's actions as "discriminatory" in this August 5, 2022, meeting.  *Compare* Doc. 85 at 10 ("Before her September 28, 2022, email complaint Plaintiff had never used the term 'discrimination' to anyone at Gray[.]" (citing Doc. 87-2 at 40 (Little Dep. 202:7–16)), *with* Doc. 94 at 30 ("Little spoke the word 'discrimination' to Berenguer during conversations." (citing Doc. 94-82 at 6 (Little Aff. ¶ 15)).  This collateral dispute escalated and defendant filed a motion asking the court to strike or disregard a portion of plaintiff's affidavit about the use of "discriminatory" on August 5, 2022.  Doc. 103 at 1.  Because this dispute informs the trigger date for plaintiff's retaliatory harassment claim, the court addresses the dispute—and decides the accompanying Motion to Strike (Doc. 103)—below.  *See* § IV.B.1.  The court thus leaves the background facts recited here about the August 5, 2022 meeting bare bones, citing only the parties' stipulations.  The court provides any additional relevant details in the Motion to Strike portion of this Order.  *See id.*

According to plaintiff, the office move stemmed from Stewart's desire to monitor her.  A colleague told plaintiff that he had heard from a department head that Stewart had spoken about her at the department head's meeting.  *Id.* at 27–29 (Little Dep. 119:7–121:2).  Allegedly, Stewart said that he had moved the Weather Team offices so he "could keep a closer eye" on plaintiff's "dinner hour abuse."  Doc. 94-30 at 2 (Pl. Ex. 31).  Plaintiff filed a formal complaint. *Id.*  Defendant "acknowledged the . . . inappropriateness of the situation and stated it had/would be addressed."  *Id.*  Defendant then addressed "the leak," counseling the department head who had shared the information.  *Id.*  But, plaintiff contends, defendant never addressed the "unfounded attack" on her work ethic.  Doc. 94 at 14; *see* Doc. 94-30 at 2 (Pl. Ex. 31) (showing department head Sulzman received counseling but never mentioning defendant taking any other action in response to plaintiff's complaint).

### Weather Team Mirror Removed

On September 9, 2022, News Director Kate "Glover had the mirror in the Weather Team office removed."  Doc. 80 at 3 (Pretrial Order Stipulations ¶ 2.a.xxii.).  The Weather Team office had housed that mirror for two years.  Doc. 94-41 at 2 (Pl. Ex. 42).  And, according to plaintiff, the mirror allowed the Team to "get ready while also producing graphics" thus increasing "the workflow and efficiency of the weather department."  *Id.* at 3 (Pl. Ex. 42).  Glover explained—in an email to the Weather Team—her rationale for the mirror decision:

> The weather office is not a makeup room. . . . Doing makeup, getting dressed, and curling hair in a working weather office is unprofessional looking so, we are stopping that practice.  I have worked in many news stations and I have never seen meteorologists have a makeup room set-up in the weather office.  All of your make-up and hair should be done in the make-up room downstairs and/or the bathrooms.

*Id.* at 1 (Pl. Ex. 42).  Plaintiff testified that the female Weather Team members—and not the male members—primarily used the mirror.  Doc. 94-90 at 34–35 (Little Dep. 151:9–152:12) (plaintiff explaining that she had never observed the male on-air talent using the mirror).

8

### *Plaintiff's September 1, 2022, Meeting with Stewart and Glover*

Coterminous with these shifts in work conditions, plaintiff identifies other points of

contention with management.  On September 1, 2022, Stewart requested a meeting with plaintiff

to discuss her workplace issues.  Doc. 80 at 3 (Pretrial Order Stipulations ¶ 2.a.xix.).  Notes from

the meeting titled it as "Erin Little Workplace Issues Meeting."  Doc. 94-36 at 1 (Pl. Ex. 37).

Plaintiff objected to that collocation because she had "[n]o 'disciplinary actions on file.'"  Doc.

94 at 15 (citing Doc. 94-36 at 1 (Pl. Ex. 37)).  From her perspective, the title gave "the

impression that [she was] having performance or other issues in the workplace that need[ed] to

be addressed."  Doc. 94-10 at 3 (Pl. Ex. 11).  Glover also attended the meeting.  Doc. 94-36 at 1

(Pl. Ex. 37).

According to the meeting notes, Stewart and Glover convened the September 1 meeting

"to address the complaints of [plaintiff's] co-workers."  *Id.*  "Co-workers were complaining that

[plaintiff] was negative and engaging in negative talk about KCTV5 and Senior management."

*Id.*  Glover told plaintiff that "she could not talk negatively in the newsroom and/or about Sr.

Management."  *Id.*  Plaintiff described how Stewart "reprimanded and criticized" her at the

meeting "about vacation time and leadership."  Doc. 94-10 at 3 (Pl. Ex. 11).  He also allegedly

complained about how he had "only spent time with [plaintiff] over the last four

weeks . . . . deal[ing] with 'issues' related to" plaintiff.[5]  *Id.*  Plaintiff testified that both Stewart

---

[5]      Plaintiff's brief contends that—at this September 1, 2022, meeting—Stewart "berated [plaintiff]
as a 'time-suck,' whose 'nonsense' he had been dealing with for more than a month."  Doc. 94 at 15.  But
none of the portion of the summary judgment record plaintiff cites to support this proposition doesn't turn up the
"time-suck" or "nonsense" language.  *See id.* (citing Little Depo. 142;209-210).  Plaintiff's
unconventional record cite—"Little Depo. 142;209-210"—appears to invoke her own deposition at pages
142, 209 and 210, as best the court can tell.  But none of the deposition compilations—on either side of
the case caption—include pages 209 or 210 from plaintiff's deposition.  *See* Doc. 94-90 at 51–52
(jumping from deposition transcript page 202 to page 223); Doc. 94-91 at 2–4 (containing only deposition
transcript pages 15, 41, and 52).  And plaintiff's deposition testimony found on transcript page 142
describes the meeting, but never uses the words "time-suck" or "nonsense."  *See* Doc. 94-90 at 33 (Little
Dep. 142:1–25).  So, the court concludes these specific descriptions aren't supported in the record and

and Glover behaved in an "unprofessional" manner in the meeting, with Stewart "continu[ing] to berate" plaintiff and "continu[ing] to be volatile and aggressive[.]"  Doc. 94-90 at 33 (Little Dep. 142:4–9).

### September 8, 2022, Social Media Post

On September 8, 2022, Glover asked Little to remove a social media post from KCTV5's social media platform.  Doc. 80 at 3 (Pretrial Order Stipulations ¶ 2.a.xxi.).  The post referenced an event sponsored by plaintiff's personal non-profit.  *Id.*  Through the non-profit, plaintiff donated her dresses to women in need.  Doc. 94-10 at 3 (Pl. Ex. 11).  The station didn't sponsor the event.  *Id.*  Plaintiff removed the post.  Doc. 80 at 3 (Pretrial Order Stipulations ¶ 2.a.xxi.).  Plaintiff interpreted Glover's remove-the-post request as a reprimand.  Doc. 94-10 at 3 (Pl. Ex. 11).  She previously had shared posts of this nature on the station's main page without incident.  *Id.*  And plaintiff interpreted Glover's request as "another issue that touches upon [her] gender[.]"  *Id.*

### September 28, 2022, Email

On September 28, 2022, plaintiff sent an email to Stewart entitled "Report of Discrimination."  Doc. 80 at 3 (Pretrial Order Stipulations ¶ 2.a.xxv.).  The email outlined complaints she had made to management during August and September 2022.  *Id.*  In the email, plaintiff added three other grievances to those already recited by this Order.

*First*, plaintiff lodged complaints related to KCTV5's search for a new meteorologist, initiated in September 2022.  *Id.* at 3, 4 (Pretrial Order Stipulations ¶¶ 2.a.xxiii., xxvi.).  Plaintiff interpreted this search as defendant "actively interviewing candidates to replace" her.  *Id.* at 6

---

doesn't include them when reciting the facts here.  *See In re Grandote Country Club Co.*, 252 F.3d 1146, 1149 (10th Cir. 2001) ("The purpose of a summary judgment motion, unlike that of a motion to dismiss, is to determine whether there is evidence to support a party's factual claims.  Unsupported conclusory allegations thus do not create a genuine issue of fact.").

(Pretrial Order Stipulations ¶ 2.a.xxvi.).  And defendant's investigation confirmed that Stewart had directed Glover "to consider the possibility of needing to replace [plaintiff]."  Doc. 94-60 at 7 (Pl. Ex. 56A).  But plaintiff also testified that when the Weather Team changed offices (August 16, 2022), Gary Amble already had announced that he was retiring.  Doc. 94-90 at 29 (Little Dep. 121:14–21).  Gary Amble was a longtime meteorologist on KCTV5.  Doc. 94-85 at 39 (Eighme Dep. 171:10–12).  Defendant contends that the ad for a meteorologist placed August 16, 2022, was "to replace the vacancy created by the pending retirement of Gary Amble."  Doc. 94-60 at 4 (Pl. Ex. 56A).  Plaintiff also objected when she was "not invited to participate in screening or interviewing applicants, and was given very short notice to meet one of the candidates."  Doc. 80 at 6 (Pretrial Order Stipulations ¶ 2.a.xxvi.).  Other news anchors participated in the process of meeting with the two candidates.  *Id.*  According to Glover, Stewart didn't think plaintiff's involvement "would be beneficial."  Doc. 94-60 at 6 (Pl. Ex. 56A).  The candidate eventually hired—Warren Sears—"was referred, recruited, and interviewed by [plaintiff]" and she thought he was a good hire.  *Id.* at 7 (Pl. Ex. 56A); Doc. 87-2 at 4–5 (Little Dep. 38:5–39:18).

*Second*, she complained twice about responses to her requests for time off—once when a colleague commented on plaintiff's request "for another Sunday off in October" and once when plaintiff sought to use sick time for her husband's surgery.  Doc. 80 at 4–5 (Pretrial Order Stipulations ¶ 2.a.xxvi.).  Defendant approved plaintiff's time off as sick time after she asked to see the policy.  *Id.* at 5 (Pretrial Order Stipulations ¶ 2.a.xxvi.).  Unlike Meredith, Gray Media Group does not have "sick time" and only has "paid time off."  *Id.* at 3 (Pretrial Order Stipulations ¶ 2.a.xx.).

*Finally*, plaintiff's email explained that plaintiff understood she was to take over responsibility for coordinating the Weather Team's schedules as of September 5, 2022. *Id.* at 5 (Pretrial Order Stipulations ¶ 2.a.xxvi.). But, by September 20, 2022, she observed another female employee—Aurora Nelson—handling the Weather Team holiday schedule. *Id.* Glover testified that she never assigned the scheduling responsibilities to plaintiff. Doc. 87-9 at 7 (Glover Dep. 94:1–19). And she never provided plaintiff administrative access to the systems required to take on the scheduling work. *Id.* at 18 (Glover Dep. 149:2–14).

Instead, Glover recounted a conversation with plaintiff about scheduling when Glover first arrived at KCTV5 in February 2022. *Id.* at 7 (Glover Dep. 94:1–19); Doc. 80 at 2 (Pretrial Order Stipulations ¶ 2.a.xiii.) (noting Glover's starting date in February 2022). At that time, Glover expressed her surprise that plaintiff—as Chief Meteorologist—didn't handle scheduling because people occupying plaintiff's position in other markets handled scheduling. Doc. 87-9 at 7 (Glover Dep. 94:1–19). But, according to Glover, "it never went any further than that." *Id.* Glover testified that she never reassigned scheduling responsibilities to plaintiff because—when she "floated the idea"—she "got a lot of blow-back from the weather team[.]" Doc. 87-9 at 8–9 (Glover Dep. 95:22–96:5). Glover attributed that blowback to "the perception of [plaintiff] being toxic and not being a good team player." *Id.*[6] Plaintiff asserted that only women experienced negative consequences from plaintiff not handling the scheduling work because only plaintiff and another female Weather Team employee had requested time off around the holidays. Doc. 80 at 5 (Pretrial Order Stipulations ¶ 2.a.xxvi.).

---

[6]     Plaintiff asserts that these descriptions—her alleged toxicity and inability to work well with others—don't appear elsewhere in the summary judgment record. Doc. 94 at 30. But Brad Stephens and Carolyn Long both used similar descriptions for plaintiff's behavior in their declarations. *See* Doc. 88-12 at 2 (Stephens Decl. ¶ 4); Doc. 88-16 at 2 (Long Decl. ¶ 4).

Plaintiff's September 28, 2022, email explicitly linked three of her complaints about management to gender: Stewart's criticisms about plaintiff's contractual compensation and vacation-time terms; Glover's request/reprimand instructing plaintiff to take down her non-profit social media post; and the mirror's relocation. *See id.* at 4–5 (Pretrial Order Stipulations ¶ 2.a.xxvi.).

General Manager Stewart's last day of employment with defendant followed plaintiff's "Report of Discrimination" email by a few weeks. *Id.* at 7 (Pretrial Order Stipulations ¶ 2.a.xxxi.) (identifying October 12, 2022, as date of last day).

### *Defendant's Investigation into "Report of Discrimination" Email*

Defendant assigned Senior Human Resource Specialist, Laurel Berenguer, to investigate the September 28, 2022, email's allegations. *Id.* at 6 (Pretrial Order Stipulations ¶ 2.a.xxvii.). On October 11, plaintiff expressed concerns about Berenguer's role in the investigation. *Id.* at 7 (Pretrial Order Stipulations ¶ 2.a.xxix.). Plaintiff believed Berenguer also had participated in discrimination and retaliation. *Id.* Maurice Gibson, defendant's Vice-President of Human Resources, permitted Berenguer to proceed with the investigation. *Id.* (Pretrial Order Stipulations ¶ 2.a.xxx.). Plaintiff also expressed frustration with the investigation's allegedly delayed pace, spurring a string of emails from plaintiff to ever-higher levels of defendant's corporate ladder. The court outlines those emails, next.

On October 31, 2022, plaintiff emailed Jan Goldstein—Senior Human Resource Manager—to recount the inefficient nature of her first investigatory interview with Berenguer that same day. Doc. 94-49 at 1–2 (Pl. Ex. 49). Goldstein forwarded the October 31 email to VP of HR Gibson, who reminded plaintiff that he—not Goldstein—had "the authority and responsibility of reviewing employee complaints[,]" as he had "previously stated" to plaintiff. Doc. 94-50 at 1 (Pl. Ex. 50). Two days later plaintiff emailed Kevin Latek—defendant's General

Counsel and Executive Vice-President—and Pat LaPlatney—defendant's President and co-CEO.[7]  *Id.* at 3–4 (Pl. Ex. 50).  Latek responded, redirecting plaintiff to the employee relations team and noting the impropriety of the company's executive leadership interfering with an ongoing investigation.  *Id.* at 3 (Pl. Ex. 50).

On November 15, 2022, plaintiff emailed defendant's highest executive—Hilton Howell, Chairman and CEO—asking him to intervene.  Doc. 94-72 at 1–2 (Pl. Ex. 68).  The same day, she emailed Berenguer—the HR specialist investigating her "Report of Discrimination" complaint—and copied President LaPlatney and Senior HR Manager Goldstein, among others, with a list of complaints from a meeting earlier that same day.  *Id.* at 3–5.  In the email, she identified "multiple email communications" with LaPlatney and Goldstein.  *Id.* at 5.  And plaintiff promised to continue including Chairman and CEO Howell on her emails until she felt her "voice ha[d] been heard and addressed[.]"  *Id.*  VP of HR Gibson again emailed plaintiff and directed her not to email Howell, LaPlatney, Latek, or "other corporate executives who are not involved in investigating your concerns[.]"  Doc. 94-77 at 1 (Pl. Ex. 73).  Gibson concluded: "Your persistent pattern of ignoring the established chain of command circumvents the investigative process, is unacceptable behavior, and must stop immediately.  Any further instances will not be tolerated and may result in discipline up to and including termination of your employment."  *Id.*

### *Subsequent Complaints of Retaliation*

After plaintiff's September 28, 2022, "Report of Discrimination" email, her complaints shifted from discrimination to primarily retaliation and retaliatory harassment.  *See, e.g.*, Doc. 80

---

[7]    The court consulted defendant's webpage to ascertain executive titles left unclear by the record evidence, specifically the titles of LaPlatney (President & co-CEO) and Hilton Howell (Chairman & CEO).  *See* Executive Leadership, *Gray Media*, https://gray.tv/about (last visited June 16, 2025).

at 23 (identifying "October through December 2022" as characterized by "Systematic Retaliatory

Harassment" (quotation cleaned up)).  The parties stipulate that plaintiff made the following

subsequent complaints:

> • September 28, 2022. Retaliation by Nelson related to ENPS issues.
> • October 10, 2022. Retaliation by Glover, Nelson and Stewart related to Monday Night Football weather hit changes.
> • October 27, 2022. IG post 10/25 and inconsistent treatment.
> • October 27, 2022. December 1 time off entry request was hostile.
> • October 31, 2022. Office Manager (Eighme) concerns regarding time off tracking and HR role.
> • November 6, 2022. Failure to communicate with Little prior to the team regarding new hire Warren Sears.
> • November 7, 2022. Retaliation by Eighme by requesting use of PTO for bereavement.
> • November 10, 2022. Benefits enrollment assistance not keeping with protocol.
> • November 14, 2022. Winter Weather Forecast lack of communication and time constraints.
> • November 14, 2022. Rescheduling Investigatory Interviews was hostile and retaliatory and balancing of work responsibilities.
> • November 15, 2022. 6pm Newscast "Locker Room" change not communicated to Little at the same time as other anchors.
> • November 15, 2022. Winter Weather Forecast Meeting.
> • November 15, 2022. Glover Response to Investigatory Interview Times.
> • November 17/November 20. Gray's response to stalker incident.

Doc. 80 at 6–7 (Pretrial Order Stipulations ¶ 2.a.xxviii.).  The parties devote their summary

judgment efforts to just one of these subsequent complaints:  the November 17 stalker incident.[8]

*See* Doc. 94 at 21.  The court thus follows suit.

---

[8]     Defendant's motion also allocates time to plaintiff's October 27, 2022, allegation of inconsistent treatment of an Instagram post.  *See* Doc. 85 at 29.  But plaintiff's Response never mentions that incident. *See generally* Doc. 94.  So, the court doesn't address the allegation either.  *See Wheeler v. BNSF Ry. Co.*, No. 09-2270-KHV, 2010 WL 11627533, at *6 n.10 (D. Kan. June 4, 2010) (explaining court won't address issue after plaintiff "apparently abandons" it in response to defendant's summary judgment motion), *aff'd*, 418 F. App'x 738 (10th Cir. 2011).

### *The Stalker Incident*

On November 17, 2020, while off-site from KCTV5's station, plaintiff observed someone apparently videotaping her. Doc. 80 at 7 (Pretrial Order Stipulations ¶ 2.a.xxxii.). Plaintiff interpreted this individual and his behavior as posing a threat to her safety. *Id.* The incident took place during an event with plaintiff's non-profit. *Id.* (Pretrial Order Stipulations ¶¶ 2.a.xxxiii., xxxiv.). Plaintiff reported the incident to News Director Glover. *Id.* (Pretrial Order Stipulations ¶ 2.a.xxxiii.). Glover notified station employees about the alleged stalker's vehicle details—the make and model of his car and its license plate number. *Id.* (Pretrial Order Stipulations ¶ 2.a.xxxiv.). And Glover placed a picture of the individual at the station's front reception desk. *Id.* (Pretrial Order Stipulations ¶ 2.a.xxxv.). Plaintiff believed this response was inadequate, for two reasons. *Id.* (Pretrial Order Stipulations ¶ 2.a.xxxvi.). *First*, Glover failed to include the suspect's photo in the station-wide email advising that no one should admit the suspected stalker into the building. *Id. Second*, Glover failed to post the suspected stalker's photo on any of the boards at the station's entrances—boards where the station typically posted individuals subject to "Do Not Allow in Building" directives. *Id.*

### *November 20, 2022*

Two days after the stalking incident, plaintiff returned to work as scheduled. *See* Doc. 94-82 at 8 (Little Aff. ¶ 18) (explaining plaintiff wasn't scheduled to work November 18 or 19, 2022). On that day—November 20, 2022—plaintiff was in a shaky emotional state and felt "already very upset." Doc. 94-90 at 68 (Little Dep. 279:14–24). She attributed that state to the stress caused by management and the stalker. *Id.* She'd experienced already other physical and emotional manifestations of stress as well: "severe migraines, vision loss" and a 20-pound weight loss, *id.*, as well as "balance problems . . . erratic sleep, loss of appetite, anxiety, nightmares, feelings of isolation, sadness, [and] fear of the future," Doc. 94-82 at 9 (Little Aff.

16

¶ 24).  On November 20, 2022, plaintiff "spoke to five employees already in the newsroom[,]" expressing her complaints about "station management and human resources."  Doc. 80 at 8 (Pretrial Order Stipulations ¶ 2.a.xxxvii.).  Those five employees included Brad Stephens, Vince Vermillion, Ryan Pawlowski, Nick Sloan, and Morgan Mobley.  *Id.*  Two of those employees— Brad Stephens and Vince Vermillion—provided written summaries of the discussion, which the court includes below.  *Id.* (Pretrial Order Stipulations ¶ 2.a.xxxviii.).  But first, here's plaintiff's version—according to her deposition testimony—of what happened on that November 20:

Plaintiff had an informal discussion (or "talking") with several colleagues about her alleged experiences of retaliation at KCTV5.  Doc. 94-90 at 79–80 (Little Dep. 290:17–291:10).  In preparation for that discussion, plaintiff printed off a list of "the discriminatory and retaliatory acts that had happened" to her because she "wanted to show [her] colleagues[.]"  *Id.* at 81 (Little Dep. 292:8–21).  During this brief discussion—lasting, by plaintiff's estimate, two minutes— several colleagues said they were sorry and that they had watched it happen to her.  *Id.* at 81–82 (Little Dep. 292:22–293:14).  Plaintiff was "somber" and "monotone."  *Id.* at 90 (Little Dep. 301:9–10).  She explained that she was having "serious health issues due to the stress . . . due to the discriminatory behavior and retaliation at KCTV 5[.]"  *Id.* at 86 (Little Dep. 297:13–16).  She worried that "others [might] be targeted" as well.  *Id.* at 90–91 (Little Dep. 301:20–302:1).  And she feared "that there was a chance that [they might] never see [her] back in [the KCTV5] building[.]"  *Id.* at 87 (Little Dep. 298:15–17).  Finally, she told her colleagues "never [to] have a conversation [with HR] without having a [union] representative in the room."  *Id.* at 88 (Little Dep. 299:2–5).

Next, emails from Stephens and Vermillion recount this same discussion.  The underlined

portions represent those parts of their emails which, according to plaintiff, are inaccurate. *See*

Doc. 94-90 at 84–88 (Little Dep. 295:11–299:10); *id.* at 90 (Little Dep. 301:1–22).

**From:** Brad Stephens██████████
**Sent:** Sunday, November 20, 2022 5:07:30 PM
**To:** Kate Glover ◄██████████
**Subject:** Newsroom meeting

Kate,

Shortly after 3pm today Erin Little asked to speak to everyone in the newsroom. The group included me, Vince, Ryan, Nick, Morgan and Erin. She began by saying there's two sides to every story.  She said this might be the last time any of us ever saw her in the building again. She said after the 10 pm newscast tonight she was going to box up her belongings and take them home. She said she is going to take medical leave starting tomorrow because her doctors told her that coming into work at KCTV5 is bad for health and making her sick. She told us she believed she would never be allowed to come back to the newsroom and that she would be fired.
Erin then accused Kate, Aurora and Larry of trying to continually fire her for the last 4 months. She believed that she was being targeted for making too much money.  She said others in the newsroom would be targeted and fired in the future.  She said she believed that a lawsuit she filed against our former GM Andrew was the reason he left.
Erin said she felt KCTV5 was not taking her safety seriously. She said a stalker was at an event of hers last Thursday and was following her around. She said she called the police and said the man posed a threat to her and people at KCTV5.  She said KCTV5 did not post as many pictures of the man in question as she felt was safe.
She said Kate, Aurora, Larry and anyone else in HR at KCTV5 should not be trusted.  She said if any one of us ever had to deal with HR that we were to take Amy Rose with us because HR is not to be trusted.
The meeting lasted about 5 minutes.  She then said she needed to work on her 10 pm forecast.

Brad

Doc. 88-10 at 1 (Def. Ex. 29).

**From:** Vincent Vermillion ███████████████████████
**Sent:** Monday, November 21, 2022 3:06 PM
**To:** Larry Eighme ███████████████████
**Subject:** SUNDAY 11 - 20 - 22

Erin gathered the Sunday newsroom staff together (5 of us?) and took a seat and stated she wanted to address her side of the story before she *Disappeared on Monday. She did this while passing out a pack of papers to us all, three sheets of paper, highlighting times and occasions (e-mails) she was *Targeted by management.  I glanced at the handout and placed it on the desk.

She was somber and monotone.

To the best of my recollection:

- She claimed she was being targeted due to the money she makes. (mentioned this two times)
- All her doctors say her struggle is taking a toll.
- She mentioned her encounter with the *Stalker at her Non-Profit and expressed concern for the KCTV employees.
- Stressed that if we have problems here to CC the Gray Corporate HR person.
- Also claiming others maybe *Targeted

My takeaway, It was a very uncomfortable and way beyond an awkward moment.
I felt Erin was including the group in information that was no business of ours's knowing.

This was a first for me in my  three decades in this industry.

**\*Erin's words**

Doc. 88-11 at 2–3 (Def. Ex. 30).

　　After plaintiff's November 20 discussion, Mike King—defendant's Senior Vice-President and Chief Marketing Officer, who was also functioning as KCTV5's interim General Manager after Stewart's departure—decided plaintiff shouldn't go back on air that night.  Doc. 87-9 at 12 (Glover Dep. 121:1–5); Doc. 88-14 at 3–4 (Berenguer Dep. 134:20–135:4).  So, Berenguer called plaintiff during plaintiff's dinner break and directed her not to return to the

station for the 10:00pm newscast that evening.  Doc. 80 at 8 (Pretrial Order Stipulations ¶ 2.a.xxxix.); Doc. 94-52 at 21 (Pl. Ex. 52).  She informed plaintiff that they would discuss the situation the next day.  Doc. 80 at 8 (Pretrial Order Stipulations 2.a.xxxix.).  Defendant also immediately disabled plaintiff's access to her KCTV5 email and computer.  *Id.*  (Pretrial Order Stipulations ¶ 2.a.xl.).  Very early the next morning—at 2:30am on November 21, 2022— plaintiff phoned KCTV5's executive producer and told him she was taking a sick day.  *Id.* (Pretrial Order Stipulations ¶ 2.a.xli.).  Plaintiff ended up taking medical leave that began on November 21, 2022.  *Id.* (Pretrial Order Stipulations ¶ 2.a.xlii.).

### During Plaintiff's Medical Leave

On December 5, 2022, while on medical leave, plaintiff filed a charge of discrimination with the EEOC alleging sex, age, and disability discrimination, as well as hostile work environment and retaliation claims.  *Id.* at 8 (Pretrial Order Stipulations ¶ 2.a.xliii.).  On December 13, 2022, Berenguer completed and sent a 15-page report to defendant, summarizing her investigation of plaintiff's complaints.  *Id.* (Pretrial Order Stipulations ¶ 2.a.xlv.).

Plaintiff's physician released plaintiff to return to work on January 17, 2023.  Doc. 80 at 8 (Pretrial Order Stipulations ¶ 2.a.xlvii.).  Defendant informed plaintiff that she couldn't return to work before meeting with Berenguer.  *Id.*  On January 31, 2023, Berenguer interviewed plaintiff about the November 20, 2022, discussion she'd had with co-workers.  *Id.* (Pretrial Order Stipulations ¶ 2.a.xlviii.).

King—who had served as interim General Manager until Curtis Miles arrived—consulted with legal counsel, HR, and Miles about whether to bring plaintiff back after her medical leave.

Doc. 88-13 at 8, 9–10 (King Dep. 178:7–18; 179:10–180:3).[9]  According to King, he decided not

to allow plaintiff to return to the station based, at least in part, on feedback from KCTV5 staff.

*Id.* at 9–10 (King Dep. 179:21–180:9).  He cited co-workers "great concern if [plaintiff] were to

return back to the station" because of "the disruptive nature of her stay there[.]"  *Id.*  Miles

identified several co-workers—including co-anchors Carolyn Long and Brad Stephens—that had

described plaintiff to him as "disruptive," "toxic," and "hard to work with[.]"  Doc. 88-15 at 5

(Miles Dep. 14:13–18; 16:20–17:6).  Miles, along with Glover, relayed to King "instances where

other employees expressed relief that [plaintiff] was not at the station and concern about her

potentially returning and the disruptive effect that would likely have."  *Id.* at 7 (Miles Dep.

27:22–28:20).

Stephens and Long both attested that plaintiff "behaved in ways that were divisive" such

that "people were 'walking on eggshells' to avoid being brought into [plaintiff's] disputes with

management."  Doc. 88-12 at 2 (Stephens Decl. ¶ 3); Doc. 88-16 at 2 (Long Decl. ¶ 3).  And they

---

[9]      Plaintiff contends that King's cited testimony refers solely to King's decision not to allow
plaintiff to return to work on November 20, 2022, and never mentions "Pay, no Play."  Doc. 94 at 38.  But
the context of King's comments indicates just the opposite.

The questioning attorney first asked King about the Family Medical Leave Act (FMLA)—a
question that is relevant to plaintiff's leave *after* November 20, 2022.  Doc. 88-13 at 8 (King Dep. 178:1–
6).  Then, counsel asked about when plaintiff "came back from FMLA leave" and whether "she was not
allowed to continue in her role as chief meteorologist[.]"  *Id.* (King Dep. 178:7–18).  In response, King
explains that plaintiff had a contract permitting "a pay-no play circumstance."  *Id.*  King's subsequent
explanation of his decision not to allow plaintiff back in the station occurred in this context.

What's more, King then references concerns expressed by co-anchors while plaintiff was on
FMLA leave, further confirming King was testifying about a post-November 20, 2022, decision.  *Id.* at 9–
10 (King Dep. 179:21–180:9).  Plus, King suggested he discussed the decision with Curtis Miles.  *Id.* at 9
(King Dep. 179:14–20).  But Miles hadn't even started as General Manager until *after* plaintiff left on
medical leave.  *See* Doc. 94-82 at 5 (Little Aff. ¶ 11) (explaining that November 21, 2022 "was prior to
Curtis Miles becoming General Manager.").  Finally, questioning counsel later re-directed King back to
November 20, 2022.  The redirection suggests counsel also understood that that date wasn't the topic of
King's testimony and, therefore, circled back to November 20, 2022.  *See id.* at 10 (King Dep. 180:10–
17).  The court thus rejects plaintiff's argument that King's testimony refers solely to his November 20,
2022, decision not to let plaintiff return to the station.

confirmed that he spoke with Miles during plaintiff's leave of absence, expressing "concern[] about [plaintiff] returning to the station because of how that would likely . . . continue to negatively affect the employees working in the newsroom[.]"   Doc. 88-12 at 2 (Stephens Decl. ¶ 4); Doc. 88-16 at 2 (Long Decl. ¶ 4).  They described plaintiff's behavior as "toxic and disruptive."  Doc. 88-12 at 2 (Stephens Decl. ¶ 4); Doc. 88-16 at 2 (Long Decl. ¶ 4).  The co-anchors also found it "difficult to work with and around [plaintiff]" and didn't "want her to return to the station."  Doc. 88-12 at 2 (Stephens Decl. ¶ 4); Doc. 88-16 at 2 (Long Decl. ¶ 4).

### *"Pay, No Play" and Early Contract Termination*

In a letter dated February 6, 2023, Station Manager Curtis Miles informed plaintiff that defendant had decided to exercise the "Pay, No Play" option in her January 2022 Employment Agreement.  *Id.* (Pretrial Order Stipulations ¶ 2.a.xlix.).  Plaintiff thus remained off-air.  *Id.* at 9 (Pretrial Order Stipulations ¶ 2.a.l.).  But plaintiff retained the title of chief meteorologist.  Doc. 88-13 at 9 (King Dep. 179:2–3).  And defendant paid plaintiff her full salary during this period. Doc. 80 at 9 (Pretrial Order Stipulations ¶ 2.a.l.).  About one year later, on January 16, 2024, plaintiff's employment with KCTV5 ended.  *Id.*

## II.    Legal Standard

### A.    Summary Judgment

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant."  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). Even if the non-moving party fails to respond adequately, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and the moving party is entitled to judgment as a matter of law." *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. The specific "facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144

F.3d at 671).  Affidavits and testimony "must be based upon personal knowledge and set forth

facts that would be admissible in evidence; conclusory and self-serving affidavits are not

sufficient."  *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022)

(quotation cleaned up).

Finally, ever since 1986, federal courts haven't viewed summary judgment as a

"disfavored procedural shortcut[.]"  *Celotex*, 477 U.S. at 327.  Instead, it represents an important

procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"

*Id.* (quoting Fed. R. Civ. P. 1).

## B.    *McDonnell Douglas* Burden Shifting Framework

Plaintiff asserts five claims, the first four under Title VII and the other one under the

FMLA.  The familiar *McDonnell Douglas* burden-shifting framework applies to all four Title VII

claims.  *See Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012) (analyzing

indirectly supported Title VII claims under *McDonnell Douglas*).  The same framework also

applies to an FMLA retaliation claim.  *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135

(10th Cir. 2003) (applying framework to FMLA retaliation claim).  But defendant frames

plaintiff's FMLA claim as an interference claim—not a retaliation claim.  Doc. 85 at 47.

Plaintiff never challenges that characterization.[10]  *See* Doc. 94 at 57–58.  And this burden-

shifting framework doesn't apply to an FMLA interference claim.  *Metzler v. Fed. Home Loan*

*Bank*, 464 F.3d 1164, 1180 (10th Cir. 2006) ("[T]he *McDonnell Douglas* burden-shifting

---

[10]    Plaintiff's brief cites just one case in support of her FMLA claim.  Doc. 94 at 57 (quoting *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 963 (10th Cir. 2002)).  And the referenced quote plaintiff relies on assumes an interference claim.  *See Smith*, 298 F.3d at 962–63 (distinguishing entitlement/interference from discrimination/retaliation FMLA claim and addressing question of shifting of burden to employer under entitlement claim).  Coupled with defendant's characterization of plaintiff's FMLA claim as an interference claim, it's proper for the court to conclude plaintiff asserts an FMLA interference claim—not an FMLA retaliation claim.

analysis does *not* apply to interference claims[.]" (emphasis in original)).  The court thus

addresses, first, all Title VII claims under *McDonnell Douglas* before outlining the unique

burden framework applied to FMLA interference claims in § VI.

Under *McDonnell Douglas*'s burden shifting framework, a plaintiff, *first*, must establish a

prima facie case.  *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019).  The "burden on the

employee to establish a prima facie case is light[.]"  *Guy v. McDonough*, No. 20-6158, 2021 WL

3854764, at *2 (10th Cir. Aug. 30, 2021).  *Second*, if plaintiff musters a prima facie case, the

burden then shifts to defendant to produce "'a legitimate nondiscriminatory reason for its

employment decision.'"  *Bekkem*, 915 F.3d at 1267 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d

1319, 1323 (10th Cir. 1997)).  As with the employee's burden on the first step, the employer's

burden at this second stage is "exceedingly light."  *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160,

1173 (10th Cir. 2007) (internal quotation marks omitted).  *Last*, the burden shifts back to

plaintiff, requiring her "to show that there is a genuine dispute of material fact whether the

employer's proffered reason for the challenged action is pretextual—*i.e.*, unworthy of belief."

*Bekkem*, 915 F.3d at 1267 (quotation cleaned up).

The court applies this burden-shifting framework to each of plaintiff's Title VII claims,

starting with her sex-based discrimination claims, next.

## III.    Sex-Based Discrimination Claims

"Under Title VII, a plaintiff can prove discrimination in several different ways, including

proof of a hostile work environment[.]"  *Throupe v. Univ. of Denv.*, 988 F.3d 1243, 1251 (10th

Cir. 2021).  Here, plaintiff alleges both a hostile work environment and discrete acts of sex-based

discrimination premised on two adverse employment actions:  exercising her contractual "Pay,

No Play" provision and terminating her contract a year early.  The court starts with a hostile

work environment analysis, below, before taking up plaintiff's discrete-acts allegations thereafter.

### A.    Hostile Work Environment

A "'plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment.'" *Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1174 (10th Cir. 2020) (quoting *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005)).  "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)).  To survive summary judgment, hostile work environment claim, "'must show (1) that [plaintiff] was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment.'" *Sanderson*, 976 F.3d at 1174 (quoting *Medina v. Income Support Div.*, 413 F.3d 1131, 1134 (10th Cir. 2005)).  That is, a plaintiff must adduce sufficient facts at summary judgment to support a reasonable finding that "the workplace was permeated with discriminatory intimidation, ridicule, and insult." *Kline v. Utah Anti-Discrimination & Lab. Div.*, 418 F. App'x 774, 781 (10th Cir. 2011) (quotation cleaned up).  A plaintiff also must "show that the environment was both objectively and subjectively hostile or abusive." *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012) (quotation cleaned up).

Defendant moves for summary judgment on the grounds that plaintiff can't establish a prima facie case of hostile work environment.  Doc. 85 at 24–35.  Defendant argues plaintiff hasn't adduced evidence from which a reasonable jury could infer that defendant discriminated against plaintiff because of her sex.  *Id.*  The court agrees, and it explains why, next.

### 1.    Based on Sex

The first prong of a prima facie hostile work environment claim asks whether plaintiff has presented facts from which a jury could infer that she suffered discrimination based on sex. To satisfy this initial requirement, "a plaintiff need only put forth evidence that sex was a 'motivating factor'" for defendant's conduct.  *Overfield v. Kansas*, No. 23-3057, 2024 WL 1611473, at *4  (10th Cir. Apr. 15, 2024) (quoting 42 U.S.C. § 2000e-2(m)).  To make such a showing, "a plaintiff may point to acts of harassment that are 'facially sex based'" as well as "facially sex-neutral conduct[.]"  *Throupe*, 988 F.3d at 1251 (quoting *Sanderson*, 976 F.3d at 1174).  A plaintiff may rely on facially sex-neutral conduct when that conduct—"'viewed in the context of other, overtly gender-discriminatory conduct'"—"can 'support a finding of gender animus.'"  *Id.* (quoting *Sanderson*, 976 F.3d at 1174).  Under our Circuit's precedent, a plaintiff "can use a substantial amount of arguably gender-neutral harassment to bolster a smaller amount of gender-based conduct on summary judgment."  *Chavez*, 397 F.3d at 833.  And "it is ordinarily the province of the jury to decide whether facially sex-neutral conduct constitutes harassment based on sex."  *Sanderson*, 976 F.3d at 1174.

The court thus evaluates whether plaintiff has adduced evidence for a jury to infer facially sex-based conduct by defendant.  If she has, plaintiff also may sweep in gender-neutral conduct as well.  But first, as a preliminary matter, the court addresses which evidence it should consider in its analysis of plaintiff's hostile work environment claim.

The court begins with this sub-issue because the parties dispute whether plaintiff's proffered evidence of other employees' discrimination complaints about General Manager Stewart should factor into the court's analysis.  The court decides this threshold issue, below.

a.      **Other Employees' Experiences**

Plaintiff's Summary Judgment Response leans hard into evidence of other employees' experiences.  The brief's first 11 pages outline, in great detail, how other female employees perceived and experienced Stewart in the workplace.  *See* Doc. 94 at 1–11.  And plaintiff asserts that her "mistreatment" by Stewart thus "is part of his known pattern and practice."  *Id.* at 11 (quotation cleaned up).  But the court concludes that other employees' experiences can't bear the weight of plaintiff's harassment claim here.  That's so because plaintiff fails to establish her contemporaneous awareness of the other employees' alleged harassment, *i.e.*, while plaintiff claims she was experiencing sexual harassment.[11]

*Hirase-Doi* is instructive.  61 F.3d 777.  There, plaintiff sought to establish a hostile work environment by relying, in part, on harassment endured by other employees.  *Id.* at 782.  Plaintiff's co-worker had extended "open-ended invitations to all female employees to satisfy his sexual desires" and "engaged in sexually offensive behavior to numerous women working in the

---

[11]      Plaintiff makes much of defendant's awareness—instead of plaintiff's awareness—of other women's complaints and defendant's failure to take corrective action.  Doc. 80 at 18–19 (Pretrial Order Plaintiff Factual Contentions ¶ 3.a.).  In so doing, plaintiff invokes a line of cases about defendant's knew-or-should-have-known liability in circumstances of co-worker harassment.  *See* Doc. 94 at 40–41 (citing *Thompson v. Tyson Foods, Inc.*, No. 16-2496-DDC, 2018 WL 705667 (D. Kan. Feb. 5, 2018)).  But this liability question is quite different from the question addressed here—that is, whether plaintiff establishes a prima facie case of a hostile work environment.  *Hirase-Doi* helps distinguish the two questions.  61 F.3d 777.  There, the Circuit *first* addressed whether a hostile work environment existed. *Id.* at 782–83.  *Then*, it took up defendant's knowledge of the hostile work environment to assess whether defendant was liable for harassing co-worker behavior.  *Id.* at 783–86.

Here, the court analyzes *Hirase-Doi*'s *first* question.  It needn't reach the second.  Here's why: "There are two theories for which Title VII imposes liability on an employer under a hostile work environment claim.  First, an employer incurs liability when it 'knew or should have known about the harassment but failed to stop it.'  Second, an employer is vicariously liable if one of its supervisors has harassed an employee."  *Thompson*, 2018 WL 705667, at *8 (citations omitted).  Neither party here ever disputes that the alleged harassers in the present case were plaintiff's supervisors.  So, if plaintiff establishes a hostile work environment claim here, defendant's liability would consist of vicarious liability, and not under a negligence theory.  *See id.*  Thus, the court needn't consider the level of defendant's knowledge for the purposes of plaintiff's hostile work environment claim.  And so, plaintiff misplaces her emphasis on defendant's knowledge of other women's complaints.

area." *Id.* at 780–81.  The co-worker had propositioned one employee frequently, passed a

sexually explicit note to another employee, and made sexually suggestive comments to a third.

*Id.* at 781.  Defendant argued that plaintiff couldn't rely solely on the evidence that other

workers' had experienced harassment to establish her hostile work environment.  *Id.* at 782.  Our

Circuit disagreed, explaining that "evidence of a general work atmosphere, including evidence of

harassment of other women, may be considered in evaluating a claim."  *Id.*  But, the Circuit

clarified, a plaintiff "may only rely on evidence relating to the harassment *of which she was

aware during the time* that she was allegedly subject to a hostile work environment."  *Id.*

(emphasis added).  That is, a plaintiff "could not subjectively perceive [her co-worker's]

behavior towards others as creating a hostile work environment unless she knew about that

behavior."  *Id.*  In the end, *Hirase-Doi*'s plaintiff "produced such evidence through her

affidavit[.]"  *Id.*  And in her affidavit, plaintiff alleged she had witnessed her co-worker

"harassing numerous other women during the same two month period[.]"  *Id.*  She also heard—

contemporaneously—about the co-worker's harassment of another employee from that employee

herself.  *Id.*  The Circuit concluded that plaintiff's own harassment allegations, coupled with her

real-time awareness of other harassed women, "could provide the finder of fact with a reasonable

basis upon which to find that [plaintiff] was subjected to hostile work environment sexual

harassment."  *Id.*

   But that case isn't this case.  Plaintiff doesn't provide an affidavit comparable to the one

in *Hirase-Doi*.  Indeed, more than that, plaintiff's affidavit here indicates just the opposite:  it

suggests that she learned about the others employees' complaints during discovery in this case—

not before.  *See Bird v. West Valley City*, 832 F.3d 1188, 1207 (10th Cir. 2016) (finding

plaintiff's attempt to prove gender-based hostility fails when offering "no evidence she knew

[defendant] made [an overtly gender discriminatory] statement until she conducted discovery").

Here, plaintiff attests

> The defendant withheld from production all investigative documents and complaints by co-workers and information obtained in the Laurel Berenguer investigation . . . . I am *now aware* of the specific information contained within the complaint files produced by Gray. *If I had been aware* of the details of what had been transpiring at KCTV5, as contained in Tiffany Romeo's Affidavit, and the testimony of the witnesses in this case . . . my response to many questions directed to me in my deposition would have reflected that knowledge.

Doc. 94-82 at 1–2 (Little Aff. ¶¶ 3–4) (emphasis added). Plaintiff attests that she wasn't "aware of the details of what had been transpiring . . . contained in Tiffany Romeo's Affidavit[.]" *Id.* at 2 (Little Aff. ¶ 3). But plaintiff's Response brief relies heavily on Ms. Romeo's affidavit to establish Stewart's alleged pattern of discrimination. *See* Doc. 94 at 3–5 (citing Romeo's affidavit 13 times). Plaintiff's Response brief likewise emphasizes testimony about other women's harassment under Stewart: Glover's testimony, *see id.* at 1–3, and Erin Mahoney, Kim Edney, and Carolyn Johnsen's testimony, s*ee id.* at 7–9. But, again, plaintiff's affidavit suggests that she wasn't "aware of the details of what had been transpiring at KCTV5, as contained in . . . the testimony of the witnesses in this case[.]" Doc. 94-82 at 2 (Little Aff. ¶ 3).

Plaintiff's affidavit thus sounds the death knell for her attempt to rely on other employees' alleged experiences of harassment to establish a hostile work environment. *See Frazier v. GPI KS-SH, Inc.*, No. 19-2020-JWL, 2020 WL 2523290, at *9 n.6 (D. Kan. May 18, 2020) ("In evaluating plaintiff's harassment claim, the court considers only evidence of comments or conduct relating to harassment of which plaintiff was aware during the time that he was allegedly subjected to a hostile work environment. Thus, the court disregards certain evidence in the record from other employees about [defendant's] conduct because plaintiff has failed to produce evidence indicating that he himself had knowledge of that conduct during his

employment."); *see also Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1146 (10th Cir. 2008)

("[E]vidence of a general work atmosphere, including evidence of harassment of other racial

minorities, may be considered in evaluating a claim, as long as [plaintiff] presents evidence that

[s]he knew about the offending behavior." (quotation cleaned up)); *Doe v. Hutchinson*, 728 F.

App'x 829, 833 (10th Cir. 2018) ("[Plaintiff] may rely on evidence that [alleged harasser]

directed gender-based comments to other students to help establish a general atmosphere of

harassment provided she was aware of such conduct." (quotation cleaned up)); *Bird*, 832 F.3d at

1207 ("Without evidence indicating Plaintiff was aware of [defendant's] statements before the

litigation, she cannot use them to demonstrate her subjective perception of an abusive

environment based on gender.").  Not only has plaintiff failed to produce evidence indicating she

herself was aware of Stewart's offending behavior toward other employees, but she also

produced an affidavit where she attests to the contrary.[12]

---

[12]    Plaintiff testified in her deposition that "other female colleagues . . . had expressed that they had
also been discriminated against" and that they "shared" their experiences with one another.  Doc. 94-90 at
30 (Little Dep. 130:14–22).  But plaintiff never expounded on this statement.  She never clarified who
these female colleagues were or whether they included the women whose experiences she relies on in her
briefing—Romeo, Glover, Mahoney, Edney, and Johnson.  *See id.* (never specifying who the other
colleagues were or what their complaints entailed).  Indeed, she never revealed *any* details about those
other female colleagues or their conversations *at all*, making her statement no better than a conclusory
one.  *See In re Grandote* County, 252 F.3d at 1149–50 ("Unsupported conclusory allegations . . . do not
create a genuine issue of fact.  To withstand summary judgment, the nonmoving party must come forward
with specific facts showing that there is a genuine issue for trial." (quotation cleaned up)); *see also*
§ III.A.1.b.5., below, for more fulsome discussion of conclusory statements.

    Plaintiff adduces no evidence—aside from her conclusory testimony—that she was aware of
Stewart's interactions with Romeo, Mahoney, Edney, or Johnson—all of whom were members of the
sales department, not the news team.  And while Glover was a member of the news team, plaintiff never
adduces evidence that she was aware of Stewart's alleged gender-discriminatory behavior against Glover.
Then there's the nail in the coffin:  plaintiff's sworn affidavit attests that she was *not* aware of the
complaints contained in Romeo's affidavit (and the other witnesses' testimony) until discovery.  Doc. 94-
82 at 1–2 (Little Aff. ¶¶ 2–3).

###### b.    Facially Sex-Based vs. Facially Sex-Neutral Conduct

Given plaintiff's inability to adduce evidence of real-time awareness about Stewart's treatment of other women, what remains is conduct directed at plaintiff. This conduct falls into one of two categories: facially sex based or facially sex neutral. When a plaintiff doesn't adduce summary judgment evidence indicating facially sex-based conduct, facially sex-neutral conduct can't get the job done. *See Overfield v. Kansas*, 660 F. Supp. 3d 1101, 1111 (D. Kan. 2023) ("Because Plaintiff has failed to put forth evidence showing that [the alleged harasser's] conduct was because of Plaintiff's sex, the sex-neutral conduct cannot raise an inference that she was treated a certain way because she is a woman. . . . Therefore, Defendant is entitled to summary judgment."), *aff'd*, 2024 WL 1611473 (10th Cir. Apr. 15, 2024). "[S]ummary judgment is appropriate if the plaintiff fails to provide evidence sufficient to support an inference about the defendant's sex-related motives." *Overfield*, 2024 WL 1611473, at *4. So, the court looks first to any conduct plaintiff alleges is facially sex based. To do so, the court first must define the contours of what constitutes facially sex-based conduct. *Overfield* assists in this endeavor.

In *Overfield*, the district court assessed whether conduct was facially sex-based so as to support a sex-discrimination based hostile work environment claim. There, plaintiff worked for the Eleventh Judicial District in Parsons, Kansas from 1998 until late 2021. *Overfield*, 660 F. Supp. 3d at 1105. She served as a court reporter for Judge Jeffrey Jack. *Id.* In 2017, Judge Fred Johnson accepted an appointment to the district court, as well. *Id.* A few years into Judge Johnson's term, plaintiff and Judge Johnson engaged in a tense conversation about judicial nominees and how to handle the criminal docket. *Id.* at 1106. Judge Johnson allegedly slammed his hand down on his desk multiple times during the conversation, raised his voice in an "angry and harsh and threatening" tone, and repeatedly ordered plaintiff to sit down and talk to him. *Id.* at 1106–07. Future communication issues and alleged work performance interference followed.

*Id.* at 1110.  And another female employee likewise complained about Judge Johnson, alleging that she felt "threatened, degraded, and belittled during her employment."  *Id.* at 1106.  In December 2021, *Overfield*'s plaintiff filed an action bringing claims under Title VII for a sex-based hostile work environment and for retaliation.  *Id.* at 1109.

At summary judgment, defendant argued that plaintiff's alleged harassment wasn't "because of sex[.]"  *Id.* at 1110.  In addressing this argument, the district court focused on whether Judge Johnson had made "any remarks that would indicate that his actions were because of Plaintiff's sex."  *Id.* at 1111.  Finding no such remarks in the record, the district court concluded the tense interaction between plaintiff and Judge Johnson was a "facially gender-neutral incident that ha[d] a reasonable explanation that ha[d] nothing to do with Plaintiff's sex" and so, it granted summary judgment to defendant.  *Id.*  The Tenth Circuit affirmed, on three bases.  2024 WL 1611473, at *1, *5–7.

*First*, the Circuit rejected plaintiff's similarly-situated-employees argument.  It concluded that she had "provided no evidence that the male employees were similarly situated to her."  *Id.* at *5.  No male employees worked in the clerk's office where plaintiff worked.  *Id.*  And the other male employees that were "part of the equation" either carried a different title, worked at a different location, or both.  *Id.*  So, the Circuit concluded, plaintiff's dissimilar treatment assertions were merely "conclusory."  *Id.*

*Second*, the Tenth Circuit held that plaintiff "neither provided circumstantial evidence linking sex-neutral actions to sex-based bias nor disputed non-discriminatory reasons for sex-neutral actions, precluding a jury from inferring discrimination."  *Id.* at *6.  The Circuit explained that the "undisputed evidence shows that the incident between Judge Johnson and Ms. Overfield happened because Judge Johnson wanted to discuss cooperation issues[.]"  *Id.*  The

Circuit also noted that "isolated incidents" and "personality conflicts cannot supply a basis for a reasonable jury to infer discrimination." *Id.* (quotation cleaned up).  And when it came to plaintiff hearing Judge Johnson argue with another female employee, the Circuit adopted a "more anodyne explanation" for the judge's behavior than sex-based animus:  actual performance. *Id.*  Judge Johnson criticized the other female employee for failing to complete her court reporter certification—a condition of her employment. *Id.*  The Circuit recognized "'actual performance' as a 'legitimate basis' for differential treatment." *Id.* (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002)).  That is, "Title VII does not protect an employee from reprimands for disappointing progress or poor work performance without evidence suggesting that the employee's sex played a role in those reprimands." *Id.*

*Third*, the Circuit noted "that evidence showing that an employee of the opposite sex faced similar adverse treatment to the plaintiff 'may undermine' the plaintiff's sex discrimination claim." *Id.* at *7 (quoting *Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1231 (10th Cir. 2009)).  The Circuit concluded that "Judge Johnson had personality conflicts with co-workers, both male and female." *Id.*  This catholic adverse treatment undermined any inference of sex-based animus.

The court here—informed by *Overfield*'s approach to the based-on-sex analysis—follows its contours.[13]  The court thus evaluates plaintiff's allegations of facially sex-based conduct under *Overfield*'s rubric, though it takes the three bases up in reverse order.  That is, the court

---

[13]    The court recognizes that *Overfield* is an unpublished opinion.  2024 WL 1611473.  But the court can rely on an unpublished Tenth Circuit opinion when it "has persuasive value with respect to a material issue in a case and would assist the court in its disposition[.]"  *United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005); *see also* 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  Because *Overfield* outlines a three-part analysis addressing the specific question at issue here—determining whether plaintiff alleges facially sex-based conduct—the court attaches persuasive value to it and relies on its methodology.

begins with the Circuit's third basis to affirm, similar adverse treatment followed by its logical corollary: favorable treatment of other women. Then the court addresses the Circuit's second basis for affirming by considering "isolated incidents," "personality conflicts," and criticism based on "actual performance[.]" *Overfield*, 2024 WL 1611473, at *6. The court concludes its facially sex-based conduct review by addressing the final basis for affirming summary judgment in *Overfield*: absence of sufficient similarly-situated-employee evidence.

### i. Similar Adverse Treatment

A large swath of plaintiff's complaints that allegedly identify discrimination based on sex involve similar adverse treatment for both sexes. Start with the genesis of plaintiff's complaints—the early August forced schedule change.

Plaintiff was upset that she had to shift her schedule to work on Sundays. Doc. 80 at 3 (Pretrial Order Stipulations ¶ 2.a.xv.). And she worried about the way that shift would affect the amount of time away from her children. Doc. 94-90 at 11 (Little Dep. 46:1–11). During the schedule-change discussions, Stewart told plaintiff "how he guided his wife through conversations about how to work." *Id.* Plaintiff interpreted Stewart's remark as indicating "how a woman should behave in the workplace." *Id.* And—for plaintiff—the context of the conversation gave credence to her interpretation. Their discussion included topics like plaintiff's allegedly excessive pay and how much time she'd lose away from her children because of the schedule change. So, plaintiff characterized Stewart's remark about his wife—shared in that context—as "discriminatory and unlawful behavior." *Id.*

But it's undisputed that defendant required co-workers of both genders to make the same schedule shift. Doc. 87-2 at 14 (Little Dep. 80:3–12) (identifying co-anchors Brad Stephens and Carolyn Long's schedule shift to Sundays); Doc. 94-48 at 6 (plaintiff explaining in investigative

interview that "[e]veryone's schedule had changed, the directors, all evening talent").  Requiring both male and female employees to endure a schedule shift undermines any inference of discrimination based on Stewart's remark about his wife.  *See Doe v. Univ. of Denv.*, 952 F.3d 1182, 1196 n.12 (10th Cir. 2020) ("'Because male and female employees . . . are equally disadvantaged by the [policy], we conclude that the Plan does not discriminate on the basis of [gender].'" (ellipses and brackets in original) (quoting *Saks v. Franklin Covey Co.*, 316 F.3d 337, 347 (2d Cir. 2003))).  What's more, plaintiff concedes that the schedule change's stated purpose was to provide the anchors more airtime on Sundays during the Chiefs' football season.  Doc. 87-2 at 14 (Little Dep. 80:3–12).  Stewart invoking his domestic experience in that context was less than ideal.  But his remark doesn't "indicate that his *actions* were because of [p]laintiff's sex."  *Overfield*, 660 F. Supp. 3d at 1111 (emphasis added).  Even viewing the evidence in the light most favorable to plaintiff, no reasonable jury could infer the schedule change was based on plaintiff's sex.  *See Tademy*, 614 F.3d at 1140 (agreeing with district court's conclusion that there's no evidence of animus where same conduct affected all employees).

A similar analysis applies to plaintiff's complaints about transplanting the Weather Team office and removing the office mirror.  Plaintiff concedes that moving the office upstairs affected all Weather Team members—which included both men and women.  Doc. 87-2 at 25 (Little Dep. 123:1–8) (agreeing that Mr. Bennett was part of the weather team at the time of the office move and the move "would have similarly affected him").  But plaintiff points to Stewart's alleged comment at the director heads' meeting that he moved the office to keep an eye on plaintiff's alleged dinner break abuse.  Doc. 94-90 at 27 (Little Dep. 119:7–121:1).  Drawing all inferences in favor of plaintiff as the non-movant, the court assumes Stewart made this comment—one which plaintiff, to her credit, concedes she heard from a co-worker who heard from a director

head. But even then, it's a "facially gender-neutral" remark. *Overfield*, 660 F. Supp. 3d at 1111. So, it can't aid plaintiff's quest to adduce facially sex-based conduct that would permit sweeping in facially sex-neutral conduct. And yet again, the adverse treatment of moving the office affected both genders similarly, undermining any inference of sex-based animus. *See Doe*, 952 F.3d at 1196 ("[E]vidence of an employer's discriminatory treatment of a group to which both genders can belong does not give rise to an inference of gender discrimination.").

The same goes for moving the office mirror. Plaintiff asserts that the female Weather Team members—and not the male members—primarily used the mirror, qualifying its removal as "on-the-basis-of-sex" conduct. Doc. 94-90 at 34–35 (Little Dep. 151:9–152:12) (plaintiff explaining that she had never observed the male on-air talent using the mirror). But such an argument asks the court to assume that a mirror is somehow more important for a woman to get camera-ready than for a man. And no reasonable jury could infer that mirrors are more important to women than men. Both men and women use them. That's particularly true in television broadcasting, where both men and women routinely wear makeup. And the choice to remove the mirror from the Weather Team office equally affected mirror access for both genders. *See Doe*, 952 F.3d at 1196 (holding no inference of gender discrimination based on treatment of a group to which both genders can belong).

What's more, plaintiff's News Director—a woman, Ms. Glover—made the call to relocate the mirror, thus heightening plaintiff's burden. *See Almon v. Goodyear Tire & Rubber Co.*, No. 07-4104-SAC, 2009 WL 1421199, at *7 (D. Kan. May 20, 2009) ("[A] plaintiff faces a difficult burden of establishing discrimination when the decision-maker is in the same protected class as the plaintiff." (quotation cleaned up)). And Glover provided a non-discriminatory reason for the action: preening—by men or women—in a news office is "unprofessional

looking[.]" Doc. 94-41 at 1 (Pl. Ex. 42). Removing the office mirror thus didn't create a triable issue of "treat[ing] men and women differently in the workplace." *Overfield*, 2024 WL 1611473, at *7. Both sexes encountered the same level of "adverse treatment" thereby nullifying any inference of sex-based discrimination. *Id.* In a nutshell, plaintiff's complaints about her schedule change, the office move, and the mirror's removal don't provide a basis for a reasonable jury to infer facially sex-based conduct, even with Stewart's references to his wife and remark about dinner hour abuse. The Circuit's similar-adverse-treatment analysis removes these complaints from the facially sex-based conduct category.

### ii.        Favorable Treatment of Other Women

Next, the court addresses a logical corollary to the similar-adverse-treatment analysis: favorable treatment of plaintiff's gender. A couple of plaintiff's complaints involve her own experience of unfavorable treatment while other members of her gender simultaneously experienced favorable treatment. Just as similar adverse treatment of both genders undermines an inference of discrimination, favorable treatment of other women—even when plaintiff herself experienced unfavorable treatment—invites a similar hesitation. That is, if the issue is gender, why would duties or privileges denied to plaintiff inhere simultaneously to other women? Two of plaintiff's allegations merit consideration under this corollary: Glover's alleged reassignment of plaintiff's scheduling duties and plaintiff's exclusion from interviewing meteorologist candidates.

Start with the scheduling duties. Glover allegedly removed scheduling duties she had assigned to plaintiff. Doc. 80 at 5 (Pretrial Order Stipulations ¶ 2.a.xxvi.). Plaintiff labeled this as "a demotion." Doc. 94-90 at 41 (Little Dep. 172:9–16). And she contended that only women requested vacation around the holidays, and so reassigning these duties only adversely affected

women.  Doc. 80 at 5 (Pretrial Order Stipulations ¶ 2.a.xxvi.); Doc. 94 at 16.  The parties dispute

whether Glover indeed assigned plaintiff those duties.  But the court draws this inference in

plaintiff's favor, *i.e.*, that Glover assigned—and then removed—the scheduling duties from

plaintiff.  But even so, Glover re-assigned the duties to another woman—Aurora Nelson, her

assistant news director.  Doc. 80 at 5 (Pretrial Order Stipulations ¶ 2.a.xxvi.); Doc. 87-9 at 8

(Glover Dep. 95:3–11).  Reassignment to another person in the same protected class weakens

any inference of discrimination that might otherwise follow.  *See, e.g.*, *Murray v. Gilmore*, 406

F.3d 708, 715 (D.C. Cir. 2005) ("[A] replacement within the same protected class cuts strongly

against any inference of discrimination[.]").

 And that's just the beginning of the roadblocks plaintiff encounters when she relies on

this duty reassignment to raise an inference of discrimination.  As previously referenced,

Glover's status as a female makes plaintiff's burden to establish an inference of discrimination

based on Glover's decisions more difficult.  *See Boliere v. Robert Brodgen's Olathe Buick-GMC*

*Inc.*, 706 F. Supp. 3d 1275, 1293 (D. Kan. 2023) (explaining that when plaintiff and decision-

maker are part of same protected group—while not dispositive—it "undermine[s] the

probability" that plaintiff's protected characteristic "played a role in the employment decisions").

Piling on, Glover's dual role as the person who both assigned *and* the person who later

reassigned the duties likewise diminishes an inference of discrimination.  *See, e.g.*, *Carlton v.*

*Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) ("When the same actor hires a person

already within the protected class, and then later fires that same person, it is difficult to impute to

her an invidious motivation that would be inconsistent with the decision to hire." (internal

quotation marks omitted)).  Put all together—the reassignment of scheduling duties to another

woman, the female status of the decision-maker, and the decision-maker's dual role—no

reasonable jury could infer that Glover's alleged reassigning of plaintiff's scheduling duties supports an inference of discrimination based on sex.

Neither does plaintiff's exclusion from the candidate interviews in September 2022. KCTV5 was recruiting a new meteorologist. Doc. 80 at 3 (Pretrial Order Stipulations ¶ 2.a.xxiii.). Plaintiff asserts that defendant left her out of the screening and interviewing process, or, for one candidate, provided very short notice. *Id.* at 6 (Pretrial Order Stipulations ¶ 2.a.xxvi.). Plaintiff alleges to have heard from "others" "as early as July" that she would participate in the interview process. *Id.* When defendant excluded her, plaintiff viewed that action as "discriminatory." *Id.* But this allegation suffers a similar malady as plaintiff's scheduling duties theorem. Namely, all the summary judgment evidence nullifies any finding that this exclusion turned on plaintiff's gender.

Defendant didn't exclude other women—such as news anchor Carolyn Long—from the interview process. Doc. 94-90 at 44 (Little Dep. 181:13–16) (explaining that the candidates interviewed "on the anchor desk with Brad and Carolyn"). "A plaintiff may show that the discrimination was because of sex by proving that the 'harasser treats men and women differently in the workplace.'" *Overfield*, 660 F. Supp. 3d at 1110 (D. Kan. 2023) (quoting *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007)). But that's not what plaintiff's evidence establishes here. Defendant didn't treat women—in general—differently when it came to interviewing candidates. Instead, defendant just treated plaintiff differently. And, even then, plaintiff interviewed—and advocated for—the meteorologist who defendant eventually hired, Warren Sears. Doc. 94-60 at 7 (Pl. Ex. 56A); Doc. 87-2 at 4 (Little Dep. 38:5–39:18). So, no harm resulted. *See Overfield*, 2024 WL 1611473 at *7 (noting the import of plaintiff's failure to

"argue—much less provide evidence—that any harm resulted" from alleged discriminatory conduct).

Taking full stock, the Circuit's similar-adverse-treatment analysis—and its corollary, the favorable-treatment analysis—preclude a reasonable jury from finding that several of plaintiff's allegations qualify as facially sex-based conduct. This list of things that can't qualify includes plaintiff's shift to Sunday work hours, the office location change, the mirror's removal, revocation of scheduling duties, and exclusion from candidate interviews. This analysis ends the first stop on the court's journey on *Overfield*'s path. The court moves on to the next.

Recall *Overfield*'s second basis for affirming the district court's no-facially-sex-based-conduct finding: plaintiff failed to "provide[] circumstantial evidence linking sex-neutral actions to sex-based bias" and failing to dispute "non-discriminatory reasons for sex-neutral actions[.]" 2024 WL 1611473, at *6. The Circuit applied this component of the analysis in different two ways. *To start*, it pointed to undisputed evidence that the purpose behind the meeting between Judge Johnson and Ms. Overfield was "to discuss cooperation issues[.]" *Id.* And it clarified that these types of "isolated incidents" and "personality conflicts"—along with "yelling at staff in the workplace"—"cannot supply a basis for a reasonable jury to infer discrimination." *Id.* (quotation cleaned up). *Then*, *Overfield* addressed the ways in which "actual performance" in a job can provide a "legitimate basis for differential treatment" because "Title VII does not protect an employee from reprimands for disappointing progress or poor work performance[.]" *Id.* (quotation cleaned up). The court adopts a similar bifurcated approach here.

### iii.    Isolated Incidents and Personality Conflicts

Start with isolated incidents and personality conflicts. Some of plaintiff's allegations turn on the tenor of meetings she attended with management. She alleges that Stewart—in their

initial discussion about plaintiff's shift to working on Sundays—became "aggressive and

hostile," even "irate" when speaking about plaintiff's contractual compensation and vacation

time. Doc. 94-90 at 12 (Little Dep. 52:3–21). Plaintiff describes how Stewart "was flailing his

hands in the air" and "was angry the entire time he was speaking[.]" *Id.* Plaintiff found

Stewart's manner "completely inappropriate" and not "professional[.]" *Id.* Plaintiff levels

similar complaints against Stewart for his manner during the September 1, 2022, meeting titled

"Erin Little Workplace Issues"—and she protested what the word "issues" implied. Doc. 80 at 5

(Pretrial Order Stipulations ¶ 2.a.xxvi.). Plaintiff asserts that Stewart never provided "any

specific examples about these 'issues' or [her] performance or leadership." *Id.* She likewise

took exception to the way defendant's management "push[ed] back" when she wanted to use sick

time for her husband's surgery—a request management eventually approved. *Id.* And she

complained when Ms. Nelson, the assistant news manager, implied that plaintiff had requested

repeated Sundays off. *Id.* at 4–5 (Pretrial Order Stipulations ¶ 2.a.xxvi.).

Even setting aside defendant's challenges to some of plaintiff's assertions[14] and drawing

all inferences in plaintiff's favor, a reasonable jury couldn't infer facially sex-based conduct

from any of these isolated incidents. Stewart's emotionally-charged reactions to plaintiff align

with allegations brushed aside in *Overfield*. Recall that Judge Johnson yelled at plaintiff and

slammed his hand on his desk repeatedly. *Overfield*, 660 F. Supp. 3d at 1106. Despite his

becoming "increasingly upset[,]" the district court held that a reasonable jury couldn't find Judge

---

[14]    Defendant controverts Stewart's criticism of plaintiff's compensation. According to Stewart's deposition testimony, he never said plaintiff "was being paid too much money" but instead characterized her as "[h]ighly compensated." Doc. 105-2 at 3 (Stewart Dep. 99:18–100:14). Defendant also suggests the push back about plaintiff's sick time request arose for logistical reasons—*i.e.*, defendant's organizational structure for time off didn't include a "sick time" category. *See* Doc. 80 at 3 (Pretrial Order Stipulations ¶ 2.a.xx.) ("Gray Media Group does not have 'sick time' and only has 'paid time off' (PTO).").

Johnson's actions gender-based. *Id.* at 1111. And the Circuit affirmed. *Overfield*, 2024 WL 1611473. The source of this ire had nothing to do with plaintiff's gender. So too, here.

Like the Circuit, this court likewise doesn't "condone yelling at staff in the workplace." *Id.* at *6. But no reasonable jury could conclude that a manager's frustration with an employee's contractual terms—even when expressed through a "tone and behavior" that made plaintiff "uncomfortable," *id.* at *1—translates to facially sex-based conduct. At least not without more—and plaintiff offers no more. Consider the oft-repeated refrain: Title VII is not "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Neither does titling a meeting using the word "issues" provide a triable issue of facially sex-based conduct. Nor do the incidents of push-back for a sick time request or Sundays off. These sex-neutral actions amount to isolated incidents and personality conflicts, and thus they don't create a triable issue of facially sex-based behavior.

### iv.      Actual Performance

In a similar vein, Title VII also doesn't shield employees "from reprimands for disappointing progress or poor work performance[.]" *Overfield*, 2024 WL 1611473, at *6 (citing *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1545–46 (10th Cir. 1995)). Specifically, unless evidence suggests "that the employee's sex played a role in those reprimands[,]" an employee's "'actual performance'" can supply "a 'legitimate basis' for differential treatment." *Id.* (quoting *Garrett*, 305 F.3d at 1218). *Overfield* thus concluded that Title VII didn't protect against Judge Johnson's allegedly harsh treatment of a female employee—one who needed to do a "better job" when she hadn't progressed with her court reporter certification. *Id.* Instead, "a nondiscriminatory motive"—the employee's actual job performance—explained Judge Johnson's "differential treatment[.]" *Id.* (quotation cleaned up).

Here, actual performance sheds light on plaintiff's allegations about Stewart's reference to a market research study. When discussing plaintiff's shift to Sunday work hours, Stewart waved pages from an outside study ranking plaintiff lowest among specified Kansas City meteorologists. Doc. 87-3 at 4 (Pl. Ex. 56A); Doc. 87-2 at 20 (Little Dep. 92:5–7). Stewart didn't permit plaintiff to see the study, however. Doc. 87-2 at 20 (Little Dep. 92:5–14). He suggested that plaintiff's exposure on Sundays could help move her up the ranks. *See id.* Plaintiff interpreted Stewart's use of the study in that way as "an effort to intimidate [her] and/or to create a hostile working environment." Doc. 80 at 4 (Pretrial Order Stipulations ¶ 2.a.xxvi.). But plaintiff doesn't create a triable issue of facially sex-based conduct on these facts. As in *Overfield*, "a nondiscriminatory motive" explains Stewart's behavior here: plaintiff's actual performance vis-à-vis other meteorologists in her market. 2024 WL 1611473, at *6. And that non-discriminatory motive serves as a legitimate basis for Stewart's conduct.

One final stop remains on the path of the Circuit's *Overfield* analysis. But first, the court recaps *Overfield*'s second basis. Neither isolated incidents nor personality conflicts nor differential treatment premised on actual job performance—even when stacked on top of one another—permit a jury to find or infer facially sex-based conduct. Plaintiff instead must provide some "evidence suggesting that the employee's sex played a role[.]" *Id.* Plaintiff adduces no such evidence about the contentious nature of her interactions with Stewart and other management or Stewart's references to the meteorologist market study. And so, the "non-discriminatory reasons for [defendant's] sex-neutral actions[] preclud[e] a jury from inferring discrimination" on these facts. *Id.*

### v.     Similarly Situated Employees

Lastly, *Overfield* addressed similarly situated employees. *Id.* at *5. Our Circuit concluded that plaintiff hadn't "provided evidence sufficient to permit a jury to infer sex-based motivations" because her similarly situated employee assertions "lack[ed] factual support." *Id.* More precisely, plaintiff there had failed "to identify any male employees, provide specific examples of their treatment, or demonstrate how they were otherwise similarly situated to her. Thus, her assertions about dissimilar treatment [were] 'conclusory.'" *Id.*; *see also Bird*, 832 F.3d at 1206 (finding conclusory plaintiff's assertion that defendant "'recognized the guys but not the girls'" because it "lack[ed] any context or specifics" and plaintiff's assertion that "'some of the men don't work as hard but never get in trouble for it'" because it "provide[d] no indication . . . who got in trouble, for what, or in what way"). "Unsupported conclusory allegations . . . do not create a genuine issue of fact. To withstand summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *In re Grandote County*, 252 F.3d at 1149–50 (quotation cleaned up). Without "specific facts, 'the jury is not entitled to draw an inference of discrimination' from [plaintiff's] evidence purporting to show differential treatment." *Overfield*, 2024 WL 1611473, at *5 (quoting *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007)).

Here, plaintiff asserts two allegations that premise sex-based discrimination on a similarly situated employee argument: Glover's request that plaintiff remove a social media post and Stewart's continual criticism of plaintiff's contractual compensation and vacation terms. The court takes up these two theories in turn.

*First*, Glover asked plaintiff to remove from defendant's social media platform a post about her dress-donating non-profit. Doc. 80 at 3 (Pretrial Order Stipulations ¶ 2.a.xxi.); Doc.

94-10 at 3 (Pl. Ex. 11).  Glover explained that plaintiff needed to take down the post because it "was not a weather or [KCTV5] sanctioned event[.]"  Doc. 87-2 at 37 (Little Dep. 163:4–25). Plaintiff interpreted Glover's request as a reprimand.  Doc. 94-10 at 3 (Pl. Ex. 11).  She asserted that she had "shared posts to the main page previously that were not directly related to weather or station initiatives[.]"  *Id.*  Plaintiff viewed Glover's instruction as "another issue that touches upon [her] gender[.]"  Doc. 80 at 5 (Pretrial Order Stipulations ¶ 2.a.xxvi.).  And, she testified, it showed Glover was treating her differently than her colleagues.  Doc. 87-2 at 35–36 (Little Dep. 161:3–162:2).  She, in a word (or two), "was singled out."  *Id.* at 36 (Little Dep. 162:18).  And that, plaintiff testified, is "discriminatory behavior."  *Id.* (Little Dep. 162:18–19).

But plaintiff failed to identify any preferentially treated colleagues.  Plaintiff couldn't name any colleagues who had posted similarly non-weather related, non-sanctioned content.  *Id.* at 36 (Little Dep. 162:3–24).  She testified that "she could recall instances where colleagues also posted[,]" *id.* at 36 (Little Dep. 162:3–24) but never identified who those colleagues were, what they posted, or how Glover (or other management) had responded to those posts.  She also fails to specify any previously posted content that was unrelated to weather and/or unsanctioned by defendant.  Plaintiff's complete lack of factual support to suggest Glover treated her social media post differently than she treated plaintiff's colleagues' posts cuts off a jury's ability to infer discrimination here.

Plaintiff's "assertions about dissimilar treatment" are, thereby "conclusory," *Overfield*, 2024 WL 1611473, at *5, and thus wholly insufficient to support an inference of defendant's sex-related motives.  As the Circuit clarified, the court "may not 'presume' that [plaintiff's] assertions embrace the 'specific facts' necessary to oppose a well-supported motion for summary judgment."  *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).  Relevant too

is the now-familiar heightened burden when the decision-maker—Glover—shares the protected status with plaintiff. *See Almon*, 2009 WL 1421199, at *7 ("[A] plaintiff faces a difficult burden of establishing discrimination when the decision-maker is in the same protected class as the plaintiff." (quotation cleaned up)). In short, this Glover incident falls far short of supplying a reasonable jury with a basis to infer facially sex-based conduct.

*Second*¸ Stewart repeatedly criticized plaintiff's contractual terms and suggested ending her contract early. Doc. 80 at 3, 4 (Pretrial Order Stipulations ¶¶ 2.a.xvi., xxvi.). Plaintiff contends Stewart's criticism didn't extend likewise to her male counterparts and thus revealed sex-based animus. In her affidavit, plaintiff describes Stewart's conduct about her contract. Then, she contrasts that conduct with his disinterest for contracts of her male co-workers:

> Andrew Stewart's behavior—his obsession with my contract, how much money, and how much time-off I had—affected my ability to do my job. He shook my confidence, created a false narrative about my work ethic, disrespected me in front of coworkers, and created distrust with my work colleagues . . . . I never heard a word about Stewart mentioning any of my male co-workers' contracts, ever.

Doc. 94-82 at 6 (Little Aff. ¶ 14). And in her September 28, 2022, email, plaintiff similarly asserted that Stewart's criticism was gender-based: "[R]epeated criticism of the terms of a negotiated contract seem to indicate that my gender has become the issue. My valid, legal contract negotiated in good faith has become a source of constant criticism. I feel that this issue is related to my gender." Doc. 80 at 4 (Pretrial Order Stipulations ¶ 2.a.xxvi.).

Here again, though, plaintiff's claims "lack factual support." *Overfield*, 2024 WL 1611473, at *5. Although plaintiff establishes Stewart's antagonism for her contractual terms, she never provides facts from which a jury could infer that his antagonism was sex-based. She never identifies the male co-workers whose contracts Stewart apparently ignored. Nor does she demonstrate how those co-workers were similarly situated to her. She makes no comparison

between other employees' contractual terms and her own to show that—even with similar contractual terms—Stewart treated others' contracts with less criticism. She never attempts to establish a pattern of Stewart criticizing other women's contracts, either. And, she concedes, Stewart never expressed any explicit gender distinctions in his criticism, such as "you are overpaid *for a female*" or "overpaid *as a woman*." Doc. 94-90 at 11 (Little Dep. 46:19–22) (emphasis added). In short, no factual basis exists to infer that Stewart's criticism arose from gender-related animus. Plaintiff simply has never linked this criticism to her sex with anything but her own idle speculation.

To be sure, plaintiff testified that she didn't "believe that Andrew Stewart would have said to Brad Stephens that you make an excessive amount of money." *Id.* at 9–10 (Little Dep. 44:24–45:1). And she didn't "believe that [Stewart] would have said to any other male colleague or talent that you have an excessive amount of vacation[.]" *Id.* at 10 (Little Dep. 45:1–4). But plaintiff's beliefs—no matter how sincerely held—don't count as facts. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1408 n.7 (10th Cir. 1997) (explaining that "subjective belief of discrimination is not sufficient to preclude summary judgment"). To reiterate, the court simply can't "'presume' that [plaintiff's] assertions embrace the 'specific facts' necessary[.]" *Overfield*, 2024 WL 1611473, at *5 (quoting *Lujan*, 497 U.S. (1990)). Without specific facts about who these male co-workers were, or how their contractual terms stacked up against plaintiff's, "'the jury is not entitled to draw an inference of discrimination' from [plaintiff's] evidence purporting to show differential treatment." *Id.* (quoting *Riggs*, 497 F.3d at 1117). In a word, plaintiff's differential treatment assertions about Stewart's criticism are conclusory. And conclusory allegations can't withstand summary judgment. *In re Grandote County*, 252 F.3d at 1149–50.

### vi.    Facially Sex-Based Conduct Conclusion

Plaintiff thus hasn't adduced sufficient evidence for a reasonable jury to infer facially

sex-based conduct.  Recall that "summary judgment may be warranted if the movant points to a

lack of evidence to support an essential element of [a] claim and the nonmovant cannot identify

specific facts that would create a genuine issue."  *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d

1136, 1143–44 (10th Cir. 2013).  Defendant points to the lack of evidence here of overtly

gender-based conduct.  And plaintiff didn't come forward with specific facts to create a triable

issue of facially sex-based conduct.  What's more, the absence of evidence showing facially sex-

based conduct obviates the need for a factfinder to decide whether any facially sex-neutral

conduct constitutes harassment based on sex.  *See Overfield*, 660 F. Supp. 3d at 1111 ("Because

Plaintiff has failed to put forth evidence showing that [the alleged harasser's] conduct was

because of Plaintiff's sex, the sex-neutral conduct cannot raise an inference that she was treated

in a certain way because she is a woman.").

"'If the nature of an employee's environment, however unpleasant, is not due to her

gender, she has not been the victim of sex discrimination as a result of that environment.'"

*Overfield*, 2024 WL 1611473, at *7 (quoting *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538

(10th Cir. 1994)).  Plaintiff here fails to create a triable issue of sex discrimination—the first

prong of a hostile work environment claim.  And this failure condemns her hostile work

environment claim to summary judgment.

### 2.    Sufficiently Severe or Pervasive

Given this conclusion, the court needn't consider defendant's alternative argument—that

a jury couldn't conclude that defendant's alleged conduct was either severe or pervasive.  Doc.

85 at 32–35.  So, the court proceeds to the next form of plaintiff's discrimination claim without addressing the severe and pervasive prong of the analysis.

## B.    Discrete Acts of Sex-Based Discrimination

Plaintiff next claims that she sustained sex discrimination based on specific, discrete acts by defendant.  To make a prima facie case for this version of a discrimination claim, plaintiff must present "evidence that:  (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination."  *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1215 (10th Cir. 2022) (internal quotation marks and citation omitted).

Defendant never challenges the first two prongs of this test.  *See generally* Doc. 85.  This choice makes perfect sense.  Plaintiff's gender places her in a protected class.  And plaintiff has identified two adverse employment actions:  defendant's exercise of the "Pay, No Play" contractual provision and its decision to end her contract early.  The third prong to establish plaintiff's prima facie of sex discrimination case isn't so straightforward, though.  The court takes it up, next.

"The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'"  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).  Plaintiff can establish a basis for inferring discrimination in various ways, including "actions or remarks made by decision makers that could be viewed as reflecting a discriminatory animus . . . , preferential treatment given to employees outside the protected class . . . or, more generally, upon the timing or sequence of events leading to plaintiff's termination."  *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (quotation cleaned up).

50

Plaintiff tries to establish an inference of discrimination by arguing variations on a theme: the decision-maker's discriminatory animus.  Here, Mike King—who functioned as KCTV5's interim General Manager—serves as the relevant decision maker for the inference-of-discrimination analysis.  King decided to exercise the "Pay, No Play" term in plaintiff's contract and terminate that agreement early.  *See* Doc. 88-13 at 8, 9–10 (King Dep. 178:7–18; 179:10–180:3).  But King never remarked, "commented on[,] or otherwise acknowledged" plaintiff's gender.  *See Boliere*, 706 F. Supp. 3d at 1292 (finding absence of evidence that relevant demoting and terminating decision-makers commented on or acknowledged plaintiff's gender precluded an inference of discrimination).  Nor did plaintiff adduce evidence of any other action by King that might suggest discriminatory animus.  Plaintiff correctly argues that she needn't "prove that her 'supervisors were personally prejudiced against her.'"  Doc. 94 at 50 (quoting *McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1260 (10th Cir. 1988)).  But she nonetheless must adduce *some* "evidence of discriminatory intent or motive to establish a prima facie case[.]" *McAlester*, 851 F.2d at 1260.  And there's "precious little evidence related to gender at all in this case, much less evidence of gender discrimination."  *Wright v. Portercare Adventist Health Sys.*, No. 19-cv-1067-WJM-STV, 2021 WL 119435, at *10 (D. Colo. Jan. 13, 2021), *aff'd*, 52 F.4th 1243 (10th Cir. 2022).  As defendant points out, plaintiff "identifies no one outside her class who was treated any differently."  Doc. 85 at 37.  Instead, plaintiff tries two other decision-maker angles to connect the "Pay, No Play" and early termination decisions to discrimination based on sex.  The court addresses each, in turn, below.

*First*, plaintiff points to communications between King and Stewart, apparently suggesting that Stewart's alleged sex-based animus could rub off on King.  For example, plaintiff cites an early email (dated December 31, 2021) between Stewart and King discussing the amount

of vacation time awarded by plaintiff's contract.  Doc. 94 at 11.  According to plaintiff, "Stewart tells King about [plaintiff's] 'crazy' contracted-for vacation time, prompting [this comment] from King:  'Just a staggering amount of time off.'"  *Id.*  Even if the summary judgment record included this email—the court couldn't find it[15]—neither Stewart's comment nor King's response remark on plaintiff's gender.  Nor do they reference anything that a reasonable juror might construe as gender-based.

Later, plaintiff emphasizes that the "heated meetings" between plaintiff and Stewart at the beginning of August were "escalated to King" in mid-August.  Doc. 94 at 13; Doc. 94-23 at 4 (showing August 5, 2022, conversation between Berenguer and plaintiff escalated "to upper management" on August 15, 2022, specifically to King).  But the Circuit has cautioned against imputing one actor's sex-related motives onto another actor's facially neutral conduct.  *Overfield*, 2024 WL 1611473, at *7.  Granted, the Circuit allows for one inferential leap—a jury may impute the sex-related motives of one actor's gender-based conduct onto *the same actor's* facially neutral conduct.  *See Chavez*, 397 F.3d at 837 ("Plaintiffs point to several examples of gender-based harassment perpetrated by Mr. Bochenek; from this, a reasonable jury could infer that other incidents involving Mr. Bochenek . . . though facially neutral, were also motivated by gender.")  But the Circuit has explained that imputing one actor's gender-based animus onto facially neutral conduct by *other actors* is "a far greater inferential leap[.]"  *Id.*  In *Chavez*, the

---

[15] The court looked hard for this email.  Plaintiff explained that defense counsel had affixed this message as Exhibit 6 during plaintiff's September 9, 2024, deposition.  Doc. 94 at 11 n.3.  But this message isn't listed in plaintiff's summary judgment exhibit list.  Nor did the court's search for the alleged date of the email—December 31, 2021—turn up any emails bearing that date.  *See id.* at 11 (identifying Stewart as sending the email on December 31, 2021).  So, the court needn't consider this allegation.  *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. 2022) ("'Unsubstantiated allegations carry no probative weight in summary judgment proceedings.'" (quoting *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019))).  But in the end, even if the record included the email and it communicated King's statement just as plaintiff described, it still provides no basis to infer gender discrimination.

Circuit concluded, "[n]o reasonable jury could make this inference." *Id.* Imputing in this fashion proves even more troublesome when—as here—the sex-related motives of the first actor remain unsubstantiated, *see* § III.A.1.; *see also Overfield*, 2024 WL 1611473, at *7.

In sum, no reasonable jury could infer discrimination by decision-maker King because of his communications with Stewart, even if plaintiff had established Stewart held a sex-based animus. And plaintiff adduces no other evidence suggesting that King harbored sex-based animus or in any way connecting his "Pay, No Play" and early termination decisions to plaintiff's sex. *See generally* Doc. 94. There's simply no summary judgment evidence to indicate that sex was a "motivating factor" in defendant's decision. 42 U.S.C. § 2000e-2(m).

*Second*, plaintiff's other tack asserts that the court should infer that Stewart himself—before his October 12, 2022, departure—made the decision to replace plaintiff. Doc. 94 at 53. Plaintiff contends that defendant's search for a new meteorologist in September—while Stewart remained employed at KCTV5—supports this inference. *See id.* But plaintiff never successfully supported an inference that Stewart's actions were based on gender. *See* § III.A.1. So, even if a jury could infer that Stewart initiated defendant's "Pay, No Play" and early termination decisions—which is a stretch given the months between his departure and the decisions at issue—the jury wouldn't have a basis to infer that Stewart's actions were sex-based.

As with the hostile work environment claim analysis, plaintiff doesn't shoulder her prima facie burden to raise an inference of sex discrimination from defendant's decisions to exercise "Pay, No Play" or terminate her contract early. As defendant puts it, "[o]ther than her own speculation and conjecture, [plaintiff] has no evidence that [defendant's] decision was based upon her sex." Doc. 85 at 37. And so, the court grants defendant's summary judgment motion against plaintiff's sex discrimination claims.

Next up:  plaintiff's other two Title VII claims—retaliation and retaliatory harassment.

## IV.        Retaliation and Retaliatory Harassment

Title VII makes retaliation unlawful by providing that an employer may not "discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII.]"  42 U.S.C. § 2000e-3(a).  Stating a prima facie Title VII retaliation claim requires the plaintiff to show "'(1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.'"  *Bekkem*, 915 F.3d at 1267 (quoting *Khalik*, 671 F.3d at 1193).  Title VII retaliatory harassment shares the same three elements.  *See Thurman v. Kansas*, No. 23-4044-JWB, 2025 WL 859846, at *7 (D. Kan. Mar. 19, 2025).  Despite this overlap, "our court frequently has analyzed claims for retaliation and retaliatory harassment as separate and distinct claims."  *Kincaid v. Unified Sch. Dist. No. 500*, 572 F. Supp. 3d 1081, 1090 (D. Kan. 2021) (collecting cases).  Under a retaliatory harassment theory, "the adverse employment action is the harassment."  *Thurman*, 2025 WL 859846, at *7.  Courts differentiate the claims in this fashion:  a "discrete" claim of retaliation is based on a "certain retaliatory act[.]"  *Turrentine v. United Parcel Serv., Inc.*, 645 F. Supp. 2d 976, 985 (D. Kan. 2009); *see also Tademy.*, 614 F.3d at 1138 ("Discrete acts 'occur on the day that they happen.'" (quotation cleaned up) (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 110)).  But "a claim of retaliatory harassment" is "based on the aggregate effect of the actions taken against [plaintiff]."  *Turrentine*, 645 F. Supp. 2d at 985; *see also id.* at 987 (describing "a continuum of retaliatory activity").

Here, plaintiff asserts both types of claims.  The Pretrial Order, describing count two, recites that defendant "retaliated against [plaintiff] in violation of Title VII by creating a hostile

work environment and in treating her differently in the terms and conditions of her employment[.]"  Doc. 80 at 42 (Pretrial Order Plaintiff's Claims ¶ 4.a.ii.).  But the parties' papers don't draw distinct lines between the two claims.  As best the court can discern, plaintiff's retaliation claim centers on discrete acts, *i.e.*, defendant's exercising the "Pay, No Play" contractual term and terminating her contract early.  *See id.* ("The retaliation includes [defendant] keeping [plaintiff] off the air by exercising a 'pay no play' provision . . . and ending [plaintiff's] employment on January 16, 2024.");  *see also* Doc. 94 at 56–57 (arguing temporal proximity to defendant's "non-renew[al]" on February 6, 2023).  Plaintiff ties her retaliatory harassment claim, on the other hand, to the emotional distress she allegedly suffered after first lodging discrimination complaints, culminating in her decision to take medical leave in November, 2022.  *See* Doc. 94 at 19 (explaining that "systemic retaliatory harassment finally drives plaintiff to take medical leave" (quotation cleaned up));  *see also id.* at 53 (connecting plaintiff's retaliatory harassment claim to "suffering emotional distress" resulting from when defendant allegedly "criticized or verbally reprimanded" her).  The court adopts plaintiff's delineations assessing retaliation and retaliatory harassment separately under each prong of the prima facie standard, below.

### A.    Retaliation

For plaintiff's retaliation claim, the rubber hits the proverbial road on the third prong of plaintiff's prima facie case.  Plaintiff's September 28, 2022, email satisfies the first prong—protected opposition.  And defendant never suggests that plaintiff's prima facie retaliation case fails at the second prong—one requiring "'that a reasonable employee would have found the challenged action materially adverse[.]'"  *Bekkem*, 915 F.3d at 1267 (quoting *Khalik*, 671 F.3d at 1193).  So, the court assumes—without having to decide—that plaintiff has shouldered her

burden to establish the first two prongs of her prima facie retaliation case. This assumption leaves prong three.

At prong three, a plaintiff's prima facie case must demonstrate "'a causal connection existed between the protected activity and the materially adverse action.'" *Id.* (quoting *Khalik*, 671 F.3d at 1193). In short, plaintiff must show that defendant took action against her out of a desire to retaliate for her complaints. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).

Plaintiff tries to establish causation using temporal proximity. Tenth Circuit precedent allows the court to "infer retaliatory motive from a close temporal proximity between an employee's protected conduct and an employer's adverse employment action." *Id.* at 1204; *see also Aman v. Dillon Cos., Inc.*, 645 F. App'x 719, 727 (10th Cir. 2016) (temporal proximity of approximately one month can suffice to establish causation). Causation follows when the adverse action and the protected activity occur sufficiently close in time. *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) ("A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient."). But our Circuit also has "recognized that evidence of temporal proximity has minimal probative value in a retaliation case where intervening events between the employee's protected conduct and the challenged employment action provide a legitimate basis for the employer's action." *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1001–02 (10th Cir. 2011); *see also Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005) ("[E]vidence of intervening events tend[s] to undermine any inference of retaliatory motive and weaken the causal link." (citation omitted)).

Plaintiff's papers lean hard into temporal proximity. Specifically, plaintiff identifies two times when—she contends—retaliation closely followed her protected activity. *First*, plaintiff identifies a complaint email she sent to the CEO of Gray Media—Hilton Howell—on November 15, 2022. Doc. 94 at 56; Doc. 94-72 (Pl. Ex. 68) (email to CEO). Then, she notes that VP of HR Gibson replied, telling her "to follow 'the chain of command or face consequences that include termination'" just days before she was "sent home thinking she had lost her job" on November 20, 2022. Doc. 94 at 56. *Second*, plaintiff contends defendant terminated her "less than three weeks after her January 17, 2023, notice that she would be ready to return on January 31. She was non-renewed 6 days later." *Id.* at 57; *see also* Doc. 88-17 at 2 (Def. Ex. 36) (February 6, 2023, letter notifying plaintiff that defendant will exercise its "Pay, No Play" rights and terminate plaintiff's contract as of January 16, 2024). Plaintiff thus invokes two pairings— matching an alleged protected activity (a complaint email and a notice of return from medical leave) to an alleged adverse action (an email chain-of-command warning, then sending plaintiff home "thinking she had lost her job" and exercise of "Pay, No Play" and early termination).

The court is skeptical about both of plaintiff's purported temporal proximity timelines. Each pairing suffers from a different problem. On the first one, a complaint email to the CEO qualifies as a protected activity—no issue there. But the court doesn't see how a reasonable jury could find an adverse action in this pairing. Plaintiff never explains how an email chain-of-command warning or sending plaintiff home thinking she had lost her job (without actually losing her job) qualify as adverse actions. Perhaps those events were unpleasant, but a reasonable jury couldn't find they qualify as materially adverse. The second pairing suffers from the opposite deficiency. Exercise of "Pay, No Play" and early contract termination are actions a reasonable employee would find adverse. But the court doesn't see how a reasonable jury could

find protected opposition in this pairing.  Plaintiff suggests that providing notice of her return to work after medical leave serves as protected opposition.  But plaintiff offers no explanation why returning-to-work notice qualifies as protected conduct—and a reasonable jury can't make that leap on plaintiff's behalf.  Nor can plaintiff cure these timeline shortcomings by reaching further back to rope in her earlier complaints because a "three-month period, standing alone, is insufficient" to show causation.  *Meiners*, 359 F.3d at 1231.  Such timeline issues undermine a reasonable jury's ability to infer a causal connection between plaintiff's protected activity and defendant's exercise of "Pay, No Play" and early termination.  Defendant didn't focus its summary judgment energy on these timeline questions, however.  So, the court turns to defendant's argument about intervening events, next.

Defendant contends intervening events—specifically, plaintiff's "own intervening disruptive behavior" and her co-anchors' concerns about plaintiff's "toxic" presence at the station—rupture any causal connection premised on temporal proximity.  Doc. 85 at 42 (emphasis omitted); *see Fouts v. Avelo Airlines, Inc.*, No. 23-cv-508-WFJ-NHA, 2025 WL 895995, at *14 (M.D. Fla. Mar. 24, 2025) (finding plaintiff failed to establish prima facie case of ADA retaliation where "poor conduct issues" and continued "disruptive behavior" were "intervening factors [that] severed the causal chain").  These intervening events, defendant argues, preclude plaintiff from establishing the requisite causal connection.  Doc. 85 at 42. Plaintiff's Response never addresses this intervening-events argument.  Instead, plaintiff relies on the temporal proximity timelines outlined above.  Doc. 94 at 56–57.  And plaintiff contends— without elaborating or clarifying—that she "has more circumstantial support than temporal proximity alone."  *Id.*  The problem for plaintiff is, she never identifies that additional support.

Without more, plaintiff hasn't created a triable issue of causal connection between her protected activity and defendant's exercise of the "Pay, No Play" clause and early termination. *First*, plaintiff fails to identify a protected activity-adverse action pairing that could allow a reasonable jury to infer causation premised on temporal proximity. *Second*, plaintiff never overcomes—or even answers—defendant's intervening events argument. And, *finally*, plaintiff fails to adduce other evidence or present other argument that would permit a reasonable jury's inference of a causal connection. Plaintiff speculates that defendant acted with retaliatory motives. But "[e]vidence, including testimony," offered in support of or in opposition to a motion for summary judgment "must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (affirming summary judgment where plaintiff failed to establish causal connection—and thus a prima facie case—on retaliation and retaliatory discharge claims). Summary judgment is appropriate because—even drawing all inferences in the light most favorable to plaintiff—she hasn't shouldered her burden to establish a prima facie case of retaliation. One final Title VII claim remains—retaliatory harassment.

### B.    Retaliatory Harassment

Recall that the first prima facie prong for a retaliatory harassment claim requires plaintiff to show that she engaged in protected opposition to discrimination. *Thurman*, 2025 WL 859846, at *7. While an open-and-shut issue under retaliation, the analysis is far more complicated for plaintiff's retaliatory harassment claim. Specifically, the parties dispute when, exactly, plaintiff first engaged in protected opposition that would trigger a retaliatory harassment claim. *See* Doc. 94 at 56; Doc. 105 at 20–21. Plaintiff argues she first lodged a complaint of unlawful behavior under Title VII in August 2022. Doc. 80 at 42 (Pretrial Order Plaintiff's Claims ¶ 4.a.ii.). Defendant contends plaintiff "*never* used the word 'discrimination' in any of the complaints or

59

emails" before September 28, 2022. Doc. 85 at 38 (emphasis in original). This timeline discrepancy matters.

When the retaliatory harassment timeline began determines the scope of plaintiff's claim—*i.e.*, which specific allegations get included. Where a plaintiff's protected activity "*post-date[s]*" allegedly retaliatory conduct, the retaliation claim necessarily fails. *Ford*, 45 F.4th at 1226 (emphasis in original); *see also Kilcrease v. Domenico Transp. Co.*, 828 F.3d 1214, 1226 (10th Cir. 2016) (explaining that a hiring decision made *before* plaintiff asserted his ADA rights couldn't establish a causal connection). Simply put, plaintiff can't establish a retaliatory harassment claim premised on conduct occurring *before* plaintiff engaged in protected activity. That's just the way time works. The court, thus, addresses whether a reasonable jury could find that any of plaintiff's actions before September 28, 2022 constituted protected opposition. To resolve this issue, the court must take a detour and decide defendant's Motion to Strike (Doc. 103).

### 1.     Defendant's Motion to Strike (Doc. 103)

Defendant's motion asks the court to strike or otherwise disregard one paragraph of plaintiff's affidavit. [16] Doc. 103 at 1. In that paragraph, plaintiff attests that she described Stewart's behavior as "discriminatory" at an August 5, 2022, meeting with Laurel Berenguer of

---

[16]     Our Circuit recently addressed the procedural propriety of moving to strike an affidavit at the summary judgment stage. *See Merrier v. Unified Sch. Dist. No. 475*, No. 24-3110, 2025 WL 1779732, at *6 (10th Cir. June 27, 2025). There—as here—defendant asked the district court "'to *disregard or* strike'" portions of affidavits presented at summary judgment. *Id.* (emphasis in original). And the district court chose to disregard those portions. *Id.* Finding no abuse of discretion in this procedural approach, the Circuit reiterated that "Rule 56 . . . leave[s] no doubt parties may challenge, and courts may disregard, inadmissible or otherwise improper affidavits at summary judgment." *Id.* And it noted that—even had the district court struck the affidavits—the Circuit "routinely [has] overlooked that procedural irregularity." *Id.* (first citing *Chavez-Acosta v. Sw. Cheese Co., LLC*, 610 F. App'x 722, 727–28 (10th Cir. 2015); then citing *Pack v. Hickey*, 776 F. App'x 549, 556 (10th Cir. 2019)). The court here thus chooses to disregard, instead of strike, the sentence at issue—seeking to avoid any procedural irregularity. Apparently though, either approach would survive under an abuse of discretion standard.

Human Resources.  Doc. 94-82 at 6 (Little Aff. ¶ 15).  Defendant cries foul.  It contends that the record demonstrates plaintiff didn't use the word "discrimination" until late September.  Doc. 85 at 38.  It describes the paragraph as a "self-serving attestation . . . 'blatantly contradicted' by the record, specifically . . . by an audio recording that [plaintiff] herself made[.]"  Doc. 104 at 1. And it asks the court to strike or disregard this paragraph's assertion.  A brief primer on what counts as protected opposition helps explain why plaintiff's use (or non-use) of the word "discriminatory" on August 5, 2022, matters so much to the parties.

"To establish protected opposition, . . . 'the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [the relevant employment law].'"  *Guy*, 2021 WL 3854764, at *3 (brackets in original) (quoting *Hinds*, 523 F.3d at 1203).  And "the absence of a reference to unlawful discrimination . . . can preclude a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII."  *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002).

Our Circuit has explained—albeit in an unpublished decision—that making "a vague reference to discrimination and harassment without any indication that this misconduct was motivated by race (or another protected category protected by Title VII) does not constitute protected activity and will not support a retaliation claim."  *Anderson v. Acad. Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004).  *Anderson* illustrates this principle and its decisive consequences for the scope of plaintiff's retaliatory harassment allegations here.

In *Anderson*, plaintiff consistently had received evaluations rating her performance as "satisfactory or better."  *Id.* at 914.  But things changed after she submitted a complaint against her supervisor.  *Id.*  Plaintiff's complaint "characterized the nature of her grievance as

'Harassment/Discrimination.'"  *Id.* at 916.  Though this complaint asserted "a lengthy history of conduct by her supervisor[,]" it never alleged a racial bias and never tried "to show that such bias was the motivation for the mistreatment that [plaintiff] experienced."  *Id.*  When the case reached trial, the district court granted defendant's motion for judgment as a matter of law.

The Tenth Circuit affirmed, concluding plaintiff had "failed to present evidence of protected activity."  *Id.*  The Circuit reasoned that the claim might warrant a different outcome "[i]f [plaintiff] had included an allegation of mistreatment based on her race [because] this could amount to protected activity even if the allegation ultimately proved to be meritless."  *Id.* *Anderson* also explained that even if plaintiff's supervisor "did retaliate against [plaintiff] for filing a complaint, the complaint was not protected activity under Title VII; [and] consequently the supervisor's retaliation was not unlawful under Title VII."  *Id.*

Four years later, the Tenth Circuit reinforced *Anderson*'s holding in a published decision—*Hinds v. Sprint/United Management Co.*, 523 F.3d 1187.  There, plaintiff claimed that his employer had engaged in "ADEA retaliation" because plaintiff had complained about age discrimination in his workplace.  *Id.* at 1201.  The trial court—the District of Kansas—rejected plaintiff's ADEA retaliation claim.  The Tenth Circuit affirmed, organizing its analysis around five purported acts of protected activity.  Just one of the acts matters to the current discussion. Plaintiff asserted defendant had retaliated because plaintiff "critique[ed] [defendant's] management paradigms and internal policies."  *Id.* at 1203 (discussing January 2004 email).  The Tenth Circuit rejected that argument, concluding the email couldn't qualify as protected activity.

The Circuit reasoned that "[n]owhere in [the] email does [plaintiff] mention or even allude to age or age discrimination."  *Id.*  Judge Gorsuch's opinion explained that "no magic words are required," but "to qualify as protected opposition the employee must convey to the

employer his or her concern that the employer has engaged in a practice made unlawful by ADEA. General complaints about company management . . . will not suffice." *Id.* (footnote omitted); *see also Petersen*, 301 F.3d at 1188 ("[A]n employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII.").

In the current case, plaintiff unquestionably conveyed to defendant her gender-based animus concerns in the September 28, 2022, email. *See* Doc. 80 at 3–5 (Pretrial Order Stipulations ¶¶ 2.a.xxv.–xxvi.) (titling email "Report of Discrimination" and linking "gender" explicitly to three complaints—Stewart's criticisms about plaintiff's contractual compensation and vacation terms; Glover's instructions about plaintiff's non-profit post; and the mirror's removal). The question, then, is whether plaintiff conveyed gender-based animus concerns to defendant back in August, when she complained to HR's Berenguer about Stewart's harassing and bullying behavior. As *Anderson* clarifies, if plaintiff complained about Stewart—but never connected those complaints to unlawful behavior under Title VII—then Title VII doesn't protect against any retaliation premised on plaintiff's August complaints. 122 F. App'x at 916. Instead, plaintiff's August complaints would qualify as "[g]eneral complaints about company management"—not protected opposition. *Hinds*, 523 F.3d at 1203. Conversely, if plaintiff framed her August 5th complaints as sex-based discrimination, any retaliatory behavior between August 5th and September 28th would fall under Title VII's protection.

Fortunately for the court, there's a recording of the disputed August 5th meeting between plaintiff and HR. *See* Doc. 104-4. And the court's independent review of that recording's transcript confirms defendant's assertions: plaintiff never used the word discrimination—or any of its derivations—or the words "hostile," "harass," "retaliate," "gender," "sex," "male," or

"female." Doc. 104 at 6 (citing generally Doc. 104-4). Plus, the word "woman" only came up to describe an individual who helped defendant with its scheduling software. Doc. 104-4 at 27 (Meeting Tr. 26:9–11). Defendant was right. Nothing in the transcript of that August 5th meeting suggests plaintiff asserted unlawful Title VII behavior.

Tellingly, plaintiff's Response doesn't dispute the apparent discrepancy between the transcript and plaintiff's affidavit. *See generally* Doc. 110. Indeed, it concedes that plaintiff "did not use the word 'discriminatory,' nor the word 'bullied'" at the August 5th meeting. *Id.* at 9. Instead, plaintiff argues that August 5 functions as the trigger date for her retaliatory harassment claim—nonetheless—under two different theories.

*First*, plaintiff suggests that other phrases used during the meeting—like plaintiff's expression of discomfort with Stewart—show that plaintiff was "finding her voice" so as to trigger notice of unlawful behavior under Title VII. Doc. 110 at 10. To be sure, plaintiff did express her discomfort with Stewart. For example, she said that she "would like to file a formal complaint against [Stewart] that he is trying, or attempting, to end [her] contract early by making [her] feel uncomfortable." Doc. 104-4 at 13 (Meeting Tr. 12:8–10). But immediately after making that statement, plaintiff described how Stewart waved the market research papers and identified plaintiff as the lowest ranked meteorologist—both of which made plaintiff "feel undervalued" and "pressured to work every Sunday." *Id.* (Meeting Tr. 12:11–19). Plaintiff thus tied her discomfort to scheduling pressures and performance concerns—not gender.

 *Second*, plaintiff reiterates other female employees' complaints about Stewart, asserting that defendant knew from the broader context that plaintiff's August 5 complaint involved discrimination. *Id.* at 1–10. Plaintiff argues that her "complaint melded into all previous 'protected' reports of the same hostile environment." *Id.* at 1. And she points to Exhibit 12—an

August 19, 2022, email from Berenguer that lists plaintiff's August 4, 2022, complaints about "unprofessional comments, i.e. you make too much, you have too much paid time off" alongside complaints from other employees "regarding 'misogynistic' behavior." *Id.* at 5 (reproducing Doc. 94-11 at 2). Plaintiff thus contends that defendant's "pre-existing, guilty knowledge of Stewart's misogynistic, sexist harassment perpetrated against other females is highly relevant and material to prove notice" of unlawful Title VII behavior on August 5, 2022. *Id.* at 2.

Plaintiff's creative thinking is admirable. But it degrades when one turns to plaintiff's cited authorities. The cases plaintiff relies on to support her notice-from-context theory simply don't say what plaintiff asserts they say. Plaintiff's authorities address whether a plaintiff can rely on other employees' complaints to prove a hostile work environment—not whether complaints by others can trigger a defendant's notice of unlawful behavior under Title VII. *See id.* at 2 (first citing *Hirase-Doi*, 61 F.3d at 783, then citing *Ford*, 45 F.4th at 1215).[17]

Even more problematic, plaintiff's proposed interpretation of those authorities bucks our Circuit's precedent. Recall that both *Anderson* and *Hinds* require that a plaintiff must convey to a defendant a link between their complaint and unlawful behavior under Title VII. *See Anderson*, 122 F. App'x at 916; *Hinds*, 523 F.3d at 1203 ("[T]o qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [the relevant statute]."). And this requirement of linkage to unlawful

---

[17]    The court discussed *Hirase-Doi* at length, above. *See* § III.A.1.a. Plaintiff also cites *Ford*. Doc. 110 at 2 (citing *Ford*, 45 F.4th at 1215). To be sure, *Ford* addressed the role of testimony from other employees to support a hostile work environment claim. *See* 45 F.4th at 1231–32 (concluding plaintiff can rely on evidence of other employees' experiences to support her hostile work environment claim where plaintiff also "supplied evidence that she was subjected to sexual harassment" and used the other employees' evidence "to supplement her other evidence"). But *Ford* doesn't stand for the proposition that other employees' complaints can put the employer on notice that a *separate* employee's complaint— which never invokes discrimination or any comparable notion—involves unlawful behavior under Title VII. *See* 45 F.4th at 1215.

conduct makes sense. Imagine how wide the notice gate would swing open under plaintiff's notice-from-context theory: An employer receives complaints of protected opposition from a set of employees. Under plaintiff's theory, a court would have to consider that employer on notice, for retaliation purposes. So, a separate employee's subsequent *general management* complaint would qualify as protected conduct. Such a broad entrance doesn't comport with *Hinds*'s explicit "must convey to the employer" requirement. 523 F.3d at 1203.

The court thus rejects the theory that defendant was on notice on August 5, 2022, of unlawful behavior under Title VII. As the recording substantiates, plaintiff never used any words on that date conveying to defendant that her complaints were gender related. And the broader context of other employees' complaints doesn't furnish the requisite notice. Nor does plaintiff adduce any other evidence to establish notice before September 28, 2022.

In light of this recording and the court's rejecting plaintiff's notice-from-context theory, the court grants defendant's Motion to Strike, in part. The sentence in plaintiff's affidavit that attests to her reference to "discriminatory" behavior is "blatantly contradicted" by the audio recording transcript. *Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *see also Coble v. City of White House*, 634 F.3d 865, 869 (6th Cir. 2011) ("Although we have not had occasion to apply the *Scott* analysis to audio recordings, courts routinely look to *Scott* for guidance in determining whether the non-moving party's version of the events is so blatantly contradicted by objective evidence in the record that it fails to create a genuine issue of material fact for trial, even in the absence of a videotape."); *Clay v. San Bernardino County*, No. ED CV 19-00032-CJC (DFM), 2021 WL 4804459, at *5 (C.D. Cal.

Sept. 8, 2021) ("As a preliminary matter, the Court must address Plaintiff's allegation [as

asserted in his declaration] that his assailants had retreated to their cells before he fired the taser.

The Court finds this purported evidence to be 'blatantly contradicted' by the audio recording of

the event, such that 'no reasonable jury could believe it.'" (citation omitted)), *report and*

*recommendation adopted*, 2021 WL 4806544 (C.D. Cal. Oct. 13, 2021).  Given the blatant

contradiction here, the court won't adopt plaintiff's version of the facts as they are portrayed in

paragraph 15 of plaintiff's affidavit.  The court thus grants defendant's Motion to Strike (Doc.

103) to the extent that it requests the court disregard this sentence:  "I described Stewart's words

and actions as discriminatory, and that I felt bullied by him during our meetings on 8/3/22 and

8/4/22."  Doc. 94-82 at 6 (Little Aff. ¶ 15). [18]

---

[18]     Defendant's motion also requests attorney fees under Rule 56(h).  Doc. 104 at 10; Doc. 113 at 5.
Defendant premises this request on plaintiff's unwillingness to correct the record before the court.  Doc.
113 at 3–5.  Rule 56(h) permits the court to order a party submitting an affidavit in bad faith "to pay the
other party the reasonable expenses, including attorney's fees it incurred as a result."  The Advisory
Committee Notes clarify that sanctions under 56(h) are "discretionary, not mandatory, reflecting the
experience that courts seldom invoke the independent Rule 56 authority to impose sanctions."  Fed. R.
Civ. P. 56(h) advisory committee note to 2010 amendment.  "Bad faith in the context of Rule 56(h)
requires a deliberate or knowing act for an improper purpose."  *Masterson v. Killen*, No. 11-cv-01179-
DAD-SAB (PC), 2017 WL 892761, at *2 (E.D. Cal. Mar. 7, 2017) (quotation cleaned up), *report and
recommendation adopted*, 2017 WL 3530969 (E.D. Cal. Aug. 17, 2017).  "If a court determines the
misinformation has been included negligently rather than intentionally, it will not apply sanctions."
*Nationwide Mut. Fire Ins. Co. v. D.R. Horton, Inc.— Birmingham*, No. CV 15-351-CG-N, 2016 WL
6828206, at *4 (S.D. Ala. Nov. 18, 2016) (quotation cleaned up).  Defendant here hasn't convinced the
court that plaintiff *submitted* the affidavit in bad faith, for two reasons.

        *First*, the recording that reveals the inaccuracy in the affidavit came to light four months *after*
plaintiff submitted the affidavit.  Plaintiff submitted the affidavit on February 24, 2025.  *See* Doc. 94-82.
Plaintiff produced the recording on June 26, 2024.  Doc. 104 at 5.  And plaintiff previously testified—on
September 9, 2024—that she couldn't remember whether she had recorded the meeting at issue,
suggesting she wasn't aware of the recording's contents at that time.  Doc. 104-3 at 5 (Little Dep. 114:1–
5); *see also* Doc. 54 (identifying date of deposition as September 9, 2024).  So, it's possible plaintiff
didn't realize the inaccuracy of her statement when submitting the affidavit.

        *Second*, the recording alone—and not plaintiff's earlier deposition testimony—conclusively
establishes that plaintiff's affidavit was inaccurate.  Plaintiff's previous testimony stated just that
September 28, 2022 was the "first time [plaintiff] reported discrimination *in writing*[.]"  Doc. 104-3 at 9
(Little Dep. 202:7–16) (emphasis added).  The addition of the "in writing" qualifier here leaves open the
possibility that plaintiff reported discrimination orally before that time, as her affidavit suggests.  So, the

Having established the trigger date for plaintiff's retaliatory harassment claim—and thus the scope of allegations that come in—the court moves forward with the prima facie analysis on prong one.

### 2.    Unreasonable Activity Falls Outside Title VII Protection

In addition to contesting the trigger date, defendant also argues that plaintiff's otherwise protected activity—which allegedly triggered retaliatory harassment—was so unreasonable that it lands outside Title VII protection.  Doc. 85 at 42–46.  And activity not under Title VII's protective umbrella can't trigger retaliatory harassment under Title VII.  Defendant rests its unreasonable-so-unprotected argument on *Robbins v. Jefferson County School District R-1*, 186 F.3d 1253 (10th Cir. 1999), *abrogated on other grounds by Nat'l R.R. Passenger Corp.*, 536 U.S. 101.

In *Robbins*, plaintiff worked as a secretary for the defendant School District for 13 years. *Id.* at 1256.  During the latter part of her tenure, plaintiff complained about a tampon sign posted in the men's restroom, believing it created a hostile work environment.  *Id.*  The School District removed the sign.  *Id.*  Later that year, plaintiff filed an EEOC complaint alleging gender discrimination.  *Id.*  She contended that her employer had retaliated against her for her sign complaint by placing her on administrative leave and reducing her secretarial assignments.  *Id.* About a year later, she filed a second complaint with the EEOC after testifying adversely to the School District about another employee's termination.  *Id.*  She also sent letters to her supervisor,

---

inaccuracy of plaintiff's affidavit became apparent only on review of the recording—not before.  In sum, defendant hasn't proven that plaintiff *submitted* the affidavit in bad faith.  She may not have realized the inaccuracy of her statement at the time of submission.  Instead, defendant wants the court to impose sanctions because plaintiff wouldn't *correct* the affidavit later.  But defendant doesn't identify any authority suggesting that Rule 56(h) sanctions are appropriate when a party refuses to take subsequent corrective action.  In its discretion, therefore, the court denies the portion of defendant's Motion to Strike (Doc. 103) that requests sanctions under Rule 56(h).

the assistant superintendent, and members of the Board of Education. *Id.* The letters accused various School District officials of bias, untrustworthiness, and retaliatory conduct. *Id.* Trying to support her retaliation claim, plaintiff "point[ed] to acts specifically directed at her, based on the School District's perception of her as a troublemaker." *Id.* at 1259. The School District contended its response to plaintiff was "a measured response to a contentious, disruptive, and increasingly abusive employee." *Id.*

*Robbins* recognized "that otherwise protected conduct may be so disruptive or inappropriate as to fall outside [Title VII] protection." *Id.* (quotation cleaned up). Our Circuit thus adopted a balancing test. The test, borrowed from the Eleventh Circuit, "determine[s] the reasonableness of an employee's opposition." *Id.* (citing *Rollins v. Fla. Dep't of Law Enf't*, 868 F.2d 397, 401 (11th Cir. 1989)). In short, the test decides whether opposition is so unreasonable that it evades Title VII protection. This balancing test weighs "'the need to protect individuals asserting their rights under Title VII against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment.'" *Id.* (brackets omitted) (quoting *Rollins*, 868 F.2d at 401). Applying that test to plaintiff's behavior, *Robbins* determined that plaintiff's "barrage of inflammatory memoranda . . . often bypassing her immediate superiors" and her "frequent, voluminous, and sometimes specious complaints" "lay outside Title VII protection[.]" *Id.* at 1259, 1260. In short, plaintiff's behavior wasn't reasonable and thus it "did not constitute protected opposition." *Id.* at 1260. Our Circuit thereby affirmed the trial court's grant of summary judgment for the School District. *Id.*

The Eleventh Circuit recently revisited the borrowed balancing test and clarified that it evaluates the way an employee "level[s] her grievances" *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1140 (11th Cir. 2020). So, for example, "filing an overwhelming number of

mostly spurious complaints and frequently doing so in an insubordinate and antagonistic manner—was unreasonable" and thus unprotected conduct. *Id.* In sum, "even if an employee's oppositional conduct does not interfere with the employee's performance of her own duties, it can still be deemed unreasonable—and thereby lose its protected status—if the opposition is expressed in a manner that unreasonably disrupts other employees or the workplace in general." *Id.* at 1141. The Eleventh Circuit also highlighted just how many other circuits have adopted the "requirement that opposition to allegedly unlawful employment practices must be done in a reasonable manner[,]" thus classifying it as "well-established[.]" *Id.* (collecting cases from Second, Fourth, Fifth, Sixth, Tenth, and D.C. Circuits).

Defendant places all its retaliatory harassment eggs in *Robbins* basket. It argues that plaintiff here—like the plaintiff in *Robbins*—"engaged in a 'barrage' of 'inflammatory' emails[,]" lodged "frequent, voluminous, and sometimes specious" complaints, and "often bypassed the appropriate individuals who would be investigating her complaints[.]" Doc. 85 at 44. Defendant points to plaintiff's repeated emails to Goldstein, LaPlatney, and Latak—all members of corporate management—despite persistent warnings to follow the chain of command. *Id.* And it highlights the disruptive tenor of plaintiff's November 20, 2022 conversation with co-workers, including her warning that others would be targeted. *Id.* at 44–45. Finally, defendant points out that—at the time of the November 20 meeting—Berenguer already had interviewed plaintiff three times, providing a legitimate and appropriate avenue for plaintiff's complaints. *Id.* at 46. Instead, plaintiff took her complaints to her coworkers, "making them uncomfortable and fear for their own jobs." *Id.*

Plaintiff responds to defendant's *Robbins*-based argument with her own *Robbins* spin. She emphasizes that the facts here differ and "will not play out like *Robbins*" by noting that the

first complaint in *Robbins* involved a sign about tampon flushing.  Doc. 94 at 56.  And she

quotes *Robbins* acknowledgement that "'an employee's behavior may warrant Title VII

protection when it can be considered intemperate or disloyal.'"  *Id.* (quoting *Robbins*, 186 F.3d at

1259).  Finally, she contends that determining whether plaintiff's complaints were "objectively

unreasonable" requires a trial.  *Id.*

Defendant has the better of this argument.  Though there are factual distinctions between

*Robbins* and the present case—including the nature of the initial complaint—the significant

overlap is nonetheless striking.  Recall that *Robbins* conducted a balancing test, holding on one

side "an employer's legitimate demands for loyalty, cooperation and a generally productive work

environment" and, on the other, "the need to protect individuals asserting their rights[.]"  186

F.3d at 1259 (internal quotation marks and citation omitted).  And, the Circuit found, "frequent,

voluminous, and sometimes specious complaints[,]" "antagonistic behavior

toward . . . supervisors[,]" a "barrage of inflammatory" communications, and the "bypassing [of]

immediate superiors" too heavy to strike the requisite balance.  *Id.* at 1259–60.  Plaintiff's

oppositional conduct aligns with the opposition in *Robbins* and *Gogel* in three important

respects:  (i) her complaints were "frequent, voluminous, and sometimes specious[,]" *id.* at 1259;

(ii) she repeatedly bypassed superiors when she made her complaints; and (iii) her November 20,

2022 behavior disrupted other employees and the workplace.

*First*, take frequent, voluminous, and sometimes specious.  Just ticking off the list of

*stipulated* complaints reveals that plaintiff's opposition fits these descriptors.  Between the

retaliatory harassment trigger date (September 28, 2022) and the coworker meeting (November

20, 2022)—less than two months—plaintiff lodged various and sundry complaints covering a

multitude of management behavior.  *One*, plaintiff complained about various other employees'

slow or delayed assistance:  Nelson provided slow help to plaintiff on technology issues and the

office manager departed from protocol when helping plaintiff with benefits enrollment

assistance.  Doc. 80 at 6–7 (Pretrial Order Stipulations ¶ 2.a.xxviii.).  *Two*, plaintiff complained

about a lack of communication with plaintiff about various changes, including:  the Monday

Night Football weather hit; the newly hired meteorologist; the Winter Weather Forecast project;

and the newscast "Locker Room" change—which the other anchors learned about before

plaintiff.  *Id.  Three*, plaintiff complained about numerous issues around her time-off requests.

She allegedly experienced hostility when she requested time off; the office manager expressed

concerns about tracking plaintiff's time off; and the office manager expressed concerns about

plaintiff's request to use PTO for bereavement.  *Id.  Four*, plaintiff complained about the

investigation into her discrimination report, including:  rescheduling of investigatory interviews;

the balancing of work responsibilities and investigatory interviews; and Glover's response to her

investigatory interview concerns.  *Id.*  That list leaves, *five*, a grab bag of left over complaints

about how defendant treated plaintiff.  She alleges:  inconsistent treatment about use of profanity

on social media posts; time constraints placed on the Winter Weather Forecast project; and

defendant's allegedly insufficient response to the stalker incident.  *Id.*  No reasonable jury could

conclude these complaints lacked volume or frequency.

    And some of them also appear specious.  For example, plaintiff's first complaint after

sending the "Report of Discrimination" email occurred the very same day.  Plaintiff complained

that assistant news director Nelson didn't help plaintiff with the new software system, ENPS

(Electronic News Production System).  *Id.*  Plaintiff sent an email to Nelson accusing Nelson of

retaliating against plaintiff by refusing to help with ENPS technology issues.  Doc. 87-15 at 3

(Def. Ex. 16).  But plaintiff conceded she had no reason to believe Nelson was aware of

plaintiff's discrimination complaint—filed earlier that day—apart from her own "assumption." Doc. 87-2 at 41 (Little Dep. 219:2–24). And Nelson responded to plaintiff's email by expressly stating that she *didn't* know about plaintiff's discrimination complaint. Doc. 87-15 at 2 (Def. Ex. 16). "An employer's action against an employee cannot be *because* of that employee's protected opposition unless the employer knows the employee has engaged in protected opposition." *Petersen*, 301 F.3d at 1188 (emphasis in original). "Plaintiff must therefore point to evidence that those who acted against [her] knew of [her] formal complaints." *Singh v. Cordle*, 936 F.3d 1022, 1043 (10th Cir. 2019). And "bare speculation" of an employer's knowledge of plaintiff's protected opposition just won't do. *Lindsay v. Denv. Pub. Schs.*, 88 F.4th 1323, 1328 (10th Cir. 2023). Here, plaintiff assumed retaliatory intent, but the summary judgment facts suggest Nelson hadn't learned of plaintiff's protected opposition in the few hours since plaintiff sent her "Report of Discrimination" email. Thus, plaintiff's complaint about Nelson's retaliatory intent was specious.

*Second*, plaintiff's complaints also bypassed her superiors. Plaintiff's persistent emails to increasingly higher levels of defendant's corporate management align with our Circuit's concerns in *Robbins*. *See* Doc. 94-49 at 1–2 (Pl. Ex. 49) (email to Goldstein, defendant's Senior HR Manager); Doc. 94-50 at 3–4 (Pl. Ex. 50) (emails to Latek—defendant's Executive Vice-President and General Counsel—and LaPlatney—defendant's President and CEO); Doc. 94-72 at 1–2 (Pl. Ex. 68) (email to Howell, defendant's CEO). In *Robbins*, the Circuit characterized as unreasonable plaintiff's attempts to "bypass[] . . . immediate superiors" and lodge a "barrage" of complaints outside the chain of command. 186 F.3d at 1260. Over a three-week period—from October 31, 2022, to November 17, 2022—plaintiff contacted four increasingly elevated members of defendant's corporate management. *See* Doc. 94-72 at 3–5 (Pl. Ex. 68) (plaintiff

describing "multiple email communications" with Goldstein and LaPlatney, among others). And she promised to continue engaging in such behavior. *Id.* at 5 (Pl. Ex. 68) (plaintiff email stating she'd continue including Howell on her emails until she felt her "voice ha[d] been heard and addressed"). She persisted despite repeated reminders about where to direct her complaints and the proper chain of command. *See* Doc. 94-50 at 1 (Pl. Ex. 50) (Gibson email reminding plaintiff that he—not Goldstein—had "the authority and responsibility of reviewing employee complaints[,]" as he had "previously stated" to plaintiff); *id.* at 3 (Pl. Ex. 50) (Latek email redirecting plaintiff to employee relations team and noting impropriety of company's executive leadership interfering with ongoing investigation); Doc. 94-77 at 1 (Pl. Ex. 73) (Gibson email rebuking plaintiff for "persistent pattern of ignoring established chain of command" and directing plaintiff not to email "corporate executives who are not involved in investigating your concerns"). In *Robbins*, our Circuit held that "as a matter of law, [such bypassing] activities were not reasonable and did not constitute protected opposition." 186 F.3d at 1260.

*Finally*, *Robbins* mandated a balancing test. There's a "need to protect individuals asserting their rights under Title VII," even when their behavior may qualify as "intemperate" or "disloyal." *Id.* at 1259 (quotation cleaned up). But an employee's behavior is only reasonable—and thus entitled to protection—if that need balances with "an employer's legitimate demands for loyalty, cooperation and a generally productive work environment." *Id.* (internal quotation marks and citation omitted). As the Eleventh Circuit explained recently, an employee's opposition may lose its protected status "if the opposition is expressed in a manner that unreasonably disrupts other employees or the workplace in general." *Gogel*, 967 F.3d at 1141. Under this definition of unreasonable, plaintiff's behavior on November 20, 2022, tips her collective opposition even more convincingly into the unreasonable category.

74

Recall that on November 20, 2022 plaintiff gathered coworkers in the newsroom to talk about her experiences of retaliation.  Doc. 94-90 at 81 (Little Dep. 292:8–21).  And defendant then requested plaintiff not return to the station for the evening newscast.  Doc. 80 at 8 (Pretrial Order Stipulations ¶ 2.a.xxxix.).  Even drawing all inferences about that conversation to favor plaintiff, no triable issue exists whether plaintiff's behavior "disrupt[ed] other employees or the workplace in general" that day.  *Gogel*, 967 F.3d at 1141.  Plaintiff outlined—complete with a paper handout—her experiences of retaliation and then warned that "others [might] be targeted" as well.  Doc. 94-90 at 79–81 (Little Dep. 290:17–292:21); *id.* at 90–91 (Little Dep. 301:20– 302:1).  She also told her colleagues "never [to] have a conversation [with HR] without having a [union] representative in the room."  *Id.* at 88 (Little Dep. 299:2–5).  Such warnings undermine the "loyalty, cooperation and . . . generally productive work environment."  *Robbins*, 186 F.3d at 1259 (internal quotation marks and citation omitted).  Any reasonable factfinder would conclude as much.

Put all together—plaintiff made frequent, voluminous, sometimes specious complaints; she sent numerous, repeated emails bypassing plaintiff's superiors; and she undermined fellow employees' confidence in HR and their sense of security in their jobs.  Plaintiff hasn't created a triable issue that she leveled her opposition in a manner that survives our Circuit's balancing test. Plaintiff's behavior thus stands unprotected by Title VII.  And plaintiff's retaliatory harassment prima facie case fails at prong one.  Plaintiff hasn't shouldered her burden to show that she engaged in reasonable—and thus protected—opposition after the retaliation trigger date.

This decision leaves one final claim:  violating the Family Medical Leave Act (FMLA). But first, the court bolsters its conclusions about plaintiff's Title VII claims by briefly touching on the last two *McDonnell Douglas* framework prongs.

V.        **Legitimate, Non-Discriminatory/Non-Retaliatory Reason and Pretext**

Out of an abundance of caution, the court considers the possibility that plaintiff had carried her burden to establish a prima facie case of discrimination or retaliation.  If she had, the court would've engaged in the final two steps of the *McDonnell Douglas* burden-shifting framework:  defendant's legitimate, non-discriminatory or non-retaliatory reason for any adverse employment action and plaintiff's pretext arguments.  To add suspenders to the belt of its prima facie conclusions, the court completes the final *McDonnell Douglas* steps for the adverse employment actions of exercising the "Pay, No Play" term and ending plaintiff's contract early.

A.        **Defendant's Legitimate, Non-Discriminatory/Non-Retaliatory Reason**

If plaintiff had established her prima facie case, the burden would have shifted to defendant.  This shift would require defendant to articulate a legitimate, non-retaliatory, non-discriminatory reason for exercising the "Pay, No Play" term and ending plaintiff's contract early.  At this second step of the *McDonnell Douglas* framework, defendant doesn't "'need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion.'" *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (quoting *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992)).  "This stage of the analysis only requires the defendant to articulate a reason for the [termination] that is not, on its face, prohibited and that is reasonably specific and clear." *Id.* (quotation cleaned up).

Defendant easily carries that burden here.  Defendant's Senior Vice-President and Chief Marketing Officer—functioning as KCTV5's interim General Manager—Mike King decided to exercise the "Pay, No Play" contractual term and terminate plaintiff's employment the following year.  Doc. 88-13 at 9–10 (King Dep. 179:14–180:9).  King came to that decision after plaintiff's

76

co-workers' expressed concerns about her divisive behavior following her November 20, 2022, discussion with fellow employees. *Id.* (noting co-workers "great concern if [plaintiff] were to return back to the station" because of "the disruptive nature of her stay there"). Miles—General Manager by the time of the "Pay, No Play" decision—had relayed to King "instances where other employees expressed relief that [plaintiff] was not at the station and concern about her potentially returning and the disruptive effect that would likely have." Doc. 88-15 at 7 (Miles Dep. 27:22–28:20). Miles identified several co-workers—including co-anchors Carolyn Long and Brad Stephens—who had described plaintiff to him as "disruptive," "toxic," and "hard to work with[.]" Doc. 88-15 at 5 (Miles Dep. 14:13–18; 16:20–17:6); *see also* Doc. 88-12 at 2 (Stephens Decl. ¶¶ 3–4); Doc. 88-16 at 2 (Long Decl. ¶¶ 3–4). One can imagine that the newsroom environment works best when colleagues get along. Concerns about a disruptive co-worker, expressed by plaintiff's co-anchors, provides a legitimate, non-discriminatory, non-retaliatory reason for defendant to exercise plaintiff's "Pay, No Play" term and—one year later—terminate her contract.

## VI.        Pretext

The burden thus shifts again, this time back to plaintiff, who then must present a genuine issue of material fact that defendant's asserted reason for exercising "Pay, No Play" and ending plaintiff's contract early was pretextual. To meet this burden, plaintiff must provide evidence that "the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable factfinder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination" or retaliation. *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006). To analyze whether a reasonable juror could find pretext under this standard, the court doesn't ask "whether the employer's reasons were wise, fair or correct[.]" *Riggs*, 497

F.3d at 1118.  Instead, the court asks merely "whether the employer honestly believed its reasons and acted in good faith upon them."  *Id.* at 1119.

The court thus considers "the facts as they appeared to the person making the decision," and doesn't "second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment."  *Id.*  "The reason for this rule is plain:  [the court's] role is to prevent intentional discriminatory [employment] practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments."  *Young*, 468 F.3d at 1250; *see also Rivera v. City & County of Denver*, 365 F.3d 912, 925 (10th Cir. 2004) ("'An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment.'" (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998))).

Plaintiff's pretext arguments here are difficult to parse.  Far more telling than their overall lack of clarity, however, is the complete absence of cites to the summary judgment record.  Take what appears to serve as plaintiff's first pretext argument.  Plaintiff explains that: "The Supreme Court held also that evidence of the employer's treatment of other protected group employees is relevant to showing pretext[.]"  Doc. 94 at 43.  One would expect plaintiff to then explain—citing to the record—how defendant's treatment of other women shows pretext.  No such explanation follows.  And it's not just record cites that are missing.  Plaintiff doesn't flesh out—even *without* citing the record—how this pretext argument applies to this case's summary judgment facts.  *See id.* at 43–44.  Instead, plaintiff proceeds by noting—abstractly—that courts require flexibility for pretext.  Then, plaintiff cites case law to caution the court about fusing the prima facie and pretext steps.  *Id.*  This argument is wholly insufficient to carry plaintiff's pretext burden.  *See Collins v. Taos Bd. of Educ.*, No. CIV. 10-407 JCH-LFG, 2012 WL 12785042, at *6

(D.N.M. Sept. 20, 2012) ("The Court finds [plaintiff's] assertions insufficient to show pretext, as she wholly fails to cite to any evidence in the record that supports her position."); *Gaskin v. Sci. Applications Int'l, Inc.*, No. CIV-18-91-R, 2019 WL 1447483, at *10 (W.D. Okla. Apr. 1, 2019) ("Plaintiff fails to cite record evidence to the contrary. Thus, Plaintiff cannot show pretext[.]"), *aff'd*, 792 F. App'x 586 (10th Cir. 2019).

Plaintiff's second pretext argument fares only slightly better. Plaintiff asserts that acting contrary to company policy or practice also can establish pretext. Doc. 94 at 46. She then identifies the following policies or practices that defendant allegedly contravened: never informing Stewart of the female employees' complaints; Stewart publicly criticizing plaintiff's contract; chastising plaintiff for her Facebook post (previously considered an acceptable practice); no warnings or progressive discipline; and disciplining only Glover. *Id.* But plaintiff again fails to provide a single cite to the record in the context of this pretext argument. *See* Doc. 94 at 46. Instead, plaintiff leaves it for the court to dig around in mountains of exhibits and perhaps, one supposes, find something plaintiff hasn't bothered to identify. The court declines. It won't rifle through stacks to determine whether the record supports plaintiff's abstract propositions, *i.e.*, that defendant, indeed, had such policies and practices and that defendant, indeed, contravened them. That's plaintiff's job. And the court won't do plaintiff's work for her. *See Rocky Mountain Wild, Inc. v. U.S. Forest Serv.*, 56 F.4th 913, 927 (10th Cir. 2022) ("'Judges are not like pigs, hunting for truffles buried in briefs.'" (quotation cleaned up) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))).

The only other times plaintiff's brief uses the word "pretext" is when discussing abstract notions of pretext or making conclusory statements. Take an example of each. Plaintiff writes, "[t]he factfinder can infer discriminatory purpose just from pretext alone." Doc. 94 at 44

79

(emphasis omitted).  That's not an argument for pretext in *this* case.  Here's an example of plaintiff's conclusory statements:  "[T]here is sufficient evidence in this record to raise an issue of 'pretext' in firing plaintiff for supposed 'insubordination' or 'disruptive' actions."  *Id.* at 55.  But where is that evidence?  What is it?  Zero cites to record evidence precede or follow this statement, nor does plaintiff even explain her pretext argument.  *See Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007) ("Even though all doubts concerning pretext must be resolved in plaintiff's favor, a plaintiff's allegations alone will not defeat summary judgment.  Mere conjecture that the employer's explanation is pretext is insufficient basis to defeat summary judgment." (quotation cleaned up)).

In the end, the court is left merely with undeveloped, unsupported pretext arguments.  Defendant has articulated a legitimate motivating reason for its decisions—to preserve harmony in the news department.  The facts—as they appeared to decision-maker King—suggested that paying plaintiff *not to work or come to the station* for a year was a better option than bringing her back to that situation.  Plaintiff hasn't adduced evidence to show that explanation "so weak, implausible, inconsistent or incoherent that a reasonable factfinder could conclude that it was not [defendant's] honestly held belief[.]"  *Young*, 468 F.3d at 1250.

In short, even if the court hadn't granted summary judgment to defendant on the prima facie prong of *McDonnell Douglas*, plaintiff's pretext arguments are wholly lacking and they provide another independent basis to grant summary judgment.  In short, analyzing the evidence in the light most favorable to plaintiff and drawing all inferences in her favor, the court concludes that her pretext arguments—either individually or taken as a whole—fail to create a genuine, triable issue.

One final claim remains:  FMLA interference.

## VII.    FMLA

In the Pretrial Order, plaintiff alleges that defendant "violated the FMLA by refusing to return her to the position she held before she took leave," an on-air Chief Meteorologist.  Doc. 80 at 43 (Pretrial Order Plaintiff's Claims ¶ 4.a.iii.).  Defendant characterizes plaintiff's FMLA claim as a claim for FMLA interference.  Doc. 85 at 47.  Plaintiff never disputes this characterization.  *See* Doc. 94 at 57–58.  Instead, the singular FMLA case she quotes in the FMLA section of her brief likewise addresses FMLA entitlement/interference.  *Id.* at 57 (quoting *Smith*, 298 F.3d at 963).  The court thus analyzes plaintiff's FMLA claim as one for FMLA interference, not retaliation.

"Under the FMLA, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [under the FMLA]."  *Metzler*, 464 F.3d at 1180 (brackets in original) (quoting 29 U.S.C. § 2615(a)(1)).  "To establish a claim of FMLA interference under § 2615(a)(1), an employee must show '(1) that she was entitled to FMLA leave, (2) that some adverse action by the employer interfered with her right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of her FMLA rights.'"  *Dalpiaz v. Carbon County*, 760 F.3d 1126, 1132 (10th Cir. 2014) (quoting *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007)).  The burden rests on the employee to demonstrate the first two elements of interference are satisfied.  *Id.*

Here, the first element isn't at issue.  Defendant concedes that plaintiff "was entitled to and took FMLA leave."  Doc. 85 at 48.  The second element is less straightforward.  "In order to satisfy the second element of an interference claim, the employee must show that she was prevented from taking the full 12 weeks' of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave."  *Campbell*, 478 F.3d at 1287.  Here, the issue is whether defendant denied plaintiff reinstatement following leave.  Plaintiff

81

maintained her title as Chief Meteorologist, and continued to receive her salary for a year after her FMLA leave. Those facts suggest defendant didn't deny plaintiff reinstatement after leave. But plaintiff no longer went on-air and no longer came to the station, which suggests just the opposite. Thus, there exists sufficient evidence for a reasonable jury to find that defendant, *in effect*, denied plaintiff reinstatement following leave by never allowing her on-air again. Plaintiff thus sustains her burden to demonstrate that a reasonable jury could find the first two elements satisfied.

With the third element—sometimes categorized as an "affirmative defense"—defendant bears the burden of proof. *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1227 (10th Cir. 2012). To demonstrate that its action wasn't related to plaintiff's exercise of her FMLA rights, defendant must show that the employee "would have been terminated anyway." *Id.* Thus, "an employee may be dismissed, preventing her from exercising her statutory right to FMLA leave or reinstatement after leave if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave." *Metzler*, 464 F.3d at 1180 (quotation cleaned up). "For an employer to demonstrate that it would have terminated the employee anyway, it must provide evidence of alternative reasons for termination." *Brown*, 700 F.3d at 1227. "The question here is not whether a reasonable jury could find in favor of [defendant employer], but rather whether the evidence is so one-sided that submission to a jury is not required." *Id.*

Here, there is uncontroverted evidence that plaintiff's co-anchors—during plaintiff's medical leave—expressed their desire that plaintiff not return to the newsroom, finding her "disruptive" and "toxic" to the work environment. *See* Doc. 88-12 at 2 (Stephens Decl. ¶¶ 3–4); Doc. 88-16 at 2 (Long Decl. ¶¶ 3–4). And it's undisputed that those co-anchors shared those sentiments with Miles, who shared them with King—the ultimate decision-maker. Doc. 88-15 at

7 (Miles Dep. 27:22–28:20).  In his deposition, King attributes his decision to exercise the "Pay, No Play" to co-workers' "great concern if [plaintiff] were to return back to the station" because of "the disruptive nature of her stay there."  Doc. 88-13 at 9–10 (King Dep. 179:21–180:9). Plaintiff retorts that no one had mentioned—before February 6, 2023, that is—the specific complaints concerning her behavior that defendant cites.  Doc. 94 at 38.  But the absence of prior discussion doesn't controvert that her co-anchors came to appreciate the harmony in the newsroom during plaintiff's time away, and didn't want to return to the old regime.  And they attested to as much.  *See* Doc. 88-12 at 2 (Stephens Decl. ¶ 4) ("After Erin Little went on a leave of absence in late 2023, I spoke with Curtis Miles about whether Ms. Little would be returning to the station.  I told Mr. Miles that I was concerned about Ms. Little returning to the station because of how that would likely continue to negatively affect the employees working in the newsroom because of Ms. Little's behavior, which I and others considered to be toxic and disruptive.");  Doc. 88-16 at 2 (Long Decl. ¶ 4) (same).  In short, here "no evidence suggests that the stated reasons for termination (which do not include FMLA requests) were not the real ones." *Brown*, 700 F.3d at 1228.  Plaintiff failed to adduce evidence to controvert her co-workers' expressed desires that she not return to work or the decision-maker's explicit reliance on those desires.  And so, defendant establishes on the summary judgment facts that no reasonable jury could infer its actions were "related to . . . [plaintiff's] exercise of her FMLA rights."  *Dalpiaz*, 760 F.3d at 1132 (quotation cleaned up).  Defendant has demonstrated that it's uncontroverted that defendant would have terminated plaintiff anyway, regardless of whether she took FMLA leave.  This showing condemns plaintiff's FMLA claim to summary judgment.

**VIII.        Conclusion**

        Plaintiff failed to establish her prima facie case for any of her Title VII claims.  But even if she hadn't, plaintiff's briefing proved wholly insufficient to carry her pretext burden.  Thus,

whether on the prima facie or the pretext prong of *McDonell Douglas*, plaintiff failed to create triable issues. So, plaintiff's Title VII claims can't survive summary judgment. Plaintiff's FMLA interference claim suffers a similar fate. Defendant presented uncontroverted evidence that plaintiff's co-anchors didn't want her to return, and that defendant's decision-maker knew about and considered those desires in exercising her "Pay, No Play" contractual term. Defendant is entitled to summary judgment on all plaintiff's claims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's Motion for Summary Judgment (Doc. 84) is granted.

**IT IS FURTHER ORDERED THAT** defendant's Motion to Strike (Doc. 103) is granted in part and denied in part. The court grants defendant's request to disregard one sentence of plaintiff's affidavit, Doc. 94-82 at 6 (Little Aff. ¶ 15), in deciding summary judgment. The court denies defendant's request for attorney fees.

**IT IS SO ORDERED.**

**Dated this 2nd day of July, 2025, at Kansas City, Kansas.**

> **s/ Daniel D. Crabtree**
> **Daniel D. Crabtree**
> **United States District Judge**